## PEOPLE v. HYDE.

(Supreme Court, Special Term, New York County.   January 8, 1912.)

1. CRIMINAL LAW (§ 121*)—CHANGE OF VENUE—GROUNDS—DISCRETION OF COURT.
   A motion for a change of venue on the ground of local prejudice against accused is addressed to the discretion of the presiding justice, which is abused where he denies a motion on the ground that it is not shown conclusively that it is impossible to obtain a fair trial in the county where the venue is laid, or where he grants a motion without clear proof that there is serious doubt whether accused will receive the full benefit of the presumption of innocence until proof of guilt beyond a reasonable doubt has been adduced against him.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 241; Dec. Dig. § 121.*]

2. CRIMINAL LAW (§ 134*)—CHANGE OF PLACE OF TRIAL—PREJUDICE AGAINST ACCUSED—EVIDENCE.
   Accused seeking a change of venue on the ground of the prejudice of the people against him must clearly show that by reason of popular passion or prejudice he cannot have a fair trial in the county where the venue is laid, but he need not show this conclusively, and where he, by clear evidence, shows that he may, and probably will, be tried by a jury who are under an influence against accused, even though it cannot be detected, he is entitled to a change of venue.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 243, 251, 252; Dec. Dig. § 134.*]

3. CRIMINAL LAW (§ 134*)—CHANGE OF PLACE OF TRIAL—EVIDENCE.
   The court on motion for a change of venue on the ground of local prejudice against accused created by newspaper publications, will consider all the circumstances which it is claimed have produced a prejudice preventing a fair trial, and will consider affidavits of persons who state that, through special investigations, they have discovered the existence of prejudice, but will not consider statements by members of the bar that they believe accused cannot obtain a fair trial.
   [Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 134.*]

4. CRIMINAL LAW (§ 134*)—CHANGE OF PLACE OF TRIAL—EVIDENCE.
   On a motion by accused charged, while chamberlain of the city of New York and by virtue of his office, with bribery and with asking for and receiving a gratuity, for performing an official act, in violation of Penal Law (Consol. Laws 1909, c. 40) § 1826, for a change of place of trial on the ground of the prejudice of the people against him, evidence *held* not to show such prejudice as would prevent a fair trial, justifying the denial of the motion.
   [Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 134.*]

5. CRIMINAL LAW (§ 126*)—CHANGE OF VENUE—PREJUDICE OF THE PEOPLE.
   The mere existence of widespread comment or of a widespread belief in the guilt of accused does not prevent accused from obtaining a fair

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trial, unless there exists, in addition, a real prejudice in the community which may warp the judgment of those surrounded by such prejudice; but, where such real prejudice exists, a change of place of trial will be granted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 243; Dec. Dig. § 126.*]

Charles H. Hyde was indicted for crime, and moves for a change of the place of trial. Denied.

See, also, 146 App. Div. 633, 131 N. Y. Supp. 567.

Charles H. Hyde (John B. Stanchfield, of counsel), for the motion. Charles S. Whitman, Dist. Atty., opposed.

LEHMAN, J. The grand jury of New York county has indicted the defendant, Charles H. Hyde, for a felony alleged to have been committed by him while city chamberlain. The defendant now asks that the trial of the indictment against him be removed from New York County to a term of the Supreme Court held in and for some other county in the state of New York where a fair and impartial trial can be had, upon the ground that such fair and impartial trial cannot be had by the defendant in the county of New York, where the indictment and action are now pending.

The indictment contains four counts. The first and second counts charge, in substance, that the defendant committed the crime of bribery, in that on August 3, 1910, while he was chamberlain of the city of New York and by virtue of his office in control of the funds of the city, he induced the Northern Bank of New York and one Joseph G. Robin, a director and the chairman of the executive committee of that bank and its controlling stockholder, to loan to the Carnegie Trust Company $130,000 of the funds of the Northern Bank on defendant's promise made to the Northern Bank and to said Robin to increase the amount of the city money on deposit with the Northern Bank of New York, it being then and there to the personal advantage of and a benefit to the defendant and the said Carnegie Trust Company that said loan of $130,000 should be made by the Northern Bank to the Carnegie Trust Company. The third and fourth counts charge the above allegations as a violation of section 1826 of the Penal Law (Consol. Laws 1909, c. 40) as asking and receiving and agreeing to receive a gratuity for performing an official act.

[1] "The right of every person accused of crime to have a fair and impartial trial before an unbiased court and an unprejudiced jury is a fundamental principle of criminal jurisprudence. For the protection of persons accused of crime the law, as a safeguard against local prejudice, has benignly provided this remedy," of which the defendant now seeks to avail himself. People v. McLaughlin, 150 N. Y. 365, 375, 44 N. E. 1017, 1019. "It is well settled that a motion of this kind is addressed to the discretion of the justice at Special Term." People v. Georger, 109 App. Div. 111, 95 N. Y. Supp. 790.

[2] The principles upon which he is called upon to exercise that

discretion are equally well settled.   In the case of People v. Sammis, 3 Hun, 560, the court stated:

"It is the right both of the people and of the person accused of crime to have the trial take place in the county where the crime is alleged to have been committed. When an accused person applies to change the place of trial, he must, under all the cases, make a clear case that by reason of popular passion or prejudice he cannot have a fair and impartial trial in the county where the venue is laid."

His evidence need not, however, show conclusively that a fair and impartial trial cannot be had.   The test to be applied is whether or not the accused has shown by clear evidence that "he may and probably will be drawn into a trial by a jury who, under an influence of which they may themselves be hardly conscious—an influence which, perhaps, no human sagacity can detect—may pronounce a verdict against him and conclude his rights forever."   People v. Webb, 1 Hill, 179; People v. Diamond, 36 Misc. Rep. 71, 72 N. Y. Supp. 179; People v. Georger, 109 App. Div. 111, 95 N. Y. Supp. 790.   In other words, the discretion of the justice is abused when he denies a motion for a change of the place of trial because it is not shown conclusively that it is impossible to obtain a fair and impartial trial in the county where the venue is laid, and it is equally abused where he grants such a motion without clear proof that there is serious doubt whether upon a jury trial in this county the accused will receive the full benefit of the presumption of innocence with which the law protects him until proof of guilt, beyond a reasonable doubt, has been adduced against him.

In this case the accused was the chamberlain of the city of New York.   The charges against him resulting in the indictment naturally received a wide circulation in the newspapers, and occasioned considerable public comment and interest.   In addition, the newspapers have given wide publicity to rumors and charges affecting his personal and official probity.   The accused claims that these articles have produced such prejudice in the minds of the public that a jury cannot be picked free from the perhaps unconscious influence of the reiteration of these charges and the constant portrayal of the accused in prose, verse, and picture in a ridiculous or guilty light.   While the accused has grave right to complain of his treatment by a portion of the press, I do not think that these articles have really roused in the community any feeling which will prevent the accused from obtaining a fair trial before an impartial jury.   In reaching this conclusion I have applied no strict and technical rules to the consideration of the evidence presented to me.   I have recognized the justice of the rule that "the fairness of a trial should be above and beyond suspicion" (Moulton v. Beecher, 52 How. Prac. 182), and, as I stated at the argument, I do not consider that the case of People v. Sharp, 5 N. Y. Cr. R. 155, should be regarded as a fair precedent for the denial of the motion, for after the lapse of years I think it has become evident to the community that the fairness of a trial in that case in this county, inflamed as it was by the revelations of political and corporate dishonesty, could not have been "above and beyond suspicion."   Moreover, I have recognized

that no strict rule can be applied as to the nature and quality of the evidence to be considered upon this motion. "It is impossible until men shall have done with devices for getting up public excitement and turning it to their own account to lay down as in a category precisely what shall and shall not be received for satisfactory proof of such excitement to a degree which may endanger the impartial administration of justice." People v. Webb, supra.

[3] I have therefore given careful consideration to all the circumstances and conditions which it is claimed have produced a prejudice which might be an insuperable barrier to the fair and impartial administration of the law, for "its presence can usually be discovered only from the circumstances and conditions which produce it." People v. McLaughlin, supra. I have also given consideration to the affidavits of persons who state that through special investigation or peculiar advantage in observing the attitude of the public they have discovered the actual existence of such prejudice. I am, however, in no manner influenced by, and frankly state that I have given no consideration to, statements by members of the bar, some of whom are of great prominence, that they believe that the constant publication of derogatory articles, cartoons, and pictorial representations of the defendant has created in the community a deep-seated and continuing prejudice against the defendant, and that, under the existing conditions, they do not believe that the accused could obtain a fair and impartial trial by a jury selected from men eligible to perform jury duty in the county of New York. These statements are not evidence, and do not purport to be evidence, for they are not even submitted in the form of affidavits. They are mere statements of opinion upon the very issue upon which I am called upon to pass. The discretion to grant or refuse this motion is vested solely in the court, and not in the bar, and the submission of the opinion of members of the bar upon the proper exercise of that discretion intended to influence the court in reaching its decision is, so far as I know, without any precedent. My personal acquaintance with and respect for many of the attorneys signing these statements impel me to the belief that they themselves will upon more careful consideration concur in my conclusion that their statements of opinion must be disregarded.

[4] The circumstances and conditions disclosed by the evidence submitted upon this motion are briefly stated as follows: The accused was a close personal friend of the mayor of the city, and on January 1, 1910, was appointed by him city chamberlain. During the winter of 1910 a state senator was tried by the Legislature, and found guilty of charges of legislative corruption. The entire state became convinced that such corruption existed and the Legislature appointed a joint committee to inquire into the subject of legislative corruption. That committee began its sessions in September, 1910. In the course of its investigations, an assistant district attorney of Kings county testified that one Frank J. Gardner had informed him that a number of persons interested in racing had raised a fund of $500,000 for the purpose of defeating a bill popularly known as the "Anti-Racing Bill," that this fund was intrusted to the defendant, and that he and the

defendant had gone to Albany, and had tried to bribe as many members of the Legislature as they could reach. There is no doubt but that the newspapers gave wide publicity to these statements of the assistant district attorney and that they seized with avidity upon a charge of this kind against a public official in order to create a public sensation, and that those papers opposed to the present mayor attempted to strike at the mayor by emphasizing the charges against his appointee. There is also no doubt but that credence was given to the truth of this charge by reason of the refusal of Gardner to testify. The committee failed for a number of weeks to subpœna the defendant to appear before it, and this failure was also commented upon by the newspapers—some ascribing its failure to the fear that by calling the defendant to testify he might receive immunity from criminal prosecution, and others ascribing it to a desire to shield wrongdoers, but all uniting in the assumption that both Gardner and Hyde were guilty. The defendant, being assured that he would not be called by the committee, left the jurisdiction on December 7, 1910, and went South on the instruction of his physician. Thereafter the committee issued a subpœna for the defendant, but the defendant was cut off from communication with the city, and failed to become acquainted with the situation. The newspapers attempted to locate him, but failed, and the public became convinced that the defendant was in hiding, and did not desire to appear. Meanwhile the Northern Bank and the Carnegie Trust Company closed their doors, and, since there were public deposits of the city in the Northern Bank, the demand for the defendant's return became imperative. Early in January he was located by a friend who was seeking him, and he returned to the city on January 16th, one day after the legislative committee closed its sessions. Naturally the unfortunate coincidence of the return and the close of the investigation occasioned further comment to the effect that it was proof of the defendant's desire to avoid service of the committee's subpœna. Thereafter Gardner was indicted, and at his trial the defendant testified in his behalf. Gardner was acquitted by the jury at this trial. About the same time investigations of the affairs of the Northern Bank and the Carnegie Trust Company were begun. Throughout these proceedings the defendant's name was mentioned as connected with alleged misfeasance of officers of these institutions, and there was considerable adverse comment upon the defendant's continuing to remain in office while under suspicion. The result of these proceedings was the successive indictments of Joseph C. Robin, Joseph B. Reichmann, William J. Cummins, and this defendant. The defendant resigned his office as soon as he was indicted. Robin has pleaded guilty, and Reichmann and Cummins have now been convicted. Throughout the trials the defendant's name has been connected with Robin, Reichmann, and Cummins, and the defendant claims that in the public mind a firm belief has arisen that the successive indictments must be followed by successive convictions.

It seems to me that it would be idle to examine the newspaper articles at greater length. It may be said that they are numerous and given prominence by headlines and cartoons, that they are one-sided,

and that some are apparently inspired by a desire to hurt the mayor, who appointed this defendant to office. In addition to these articles, it appears from affidavits that there is a fairly widespread belief that the defendant is guilty. It would serve no useful purpose to analyze the affidavits here. So far as they set forth the belief of the deponents' that no fair trial can be had in this county, they represent only the personal opinion of the deponents. So far as they set forth the facts that the case has been much discussed in public places, and that the discussion has been generally unfavorable to the defendant, they are in accordance with my personal experience.

I deem it necessary to refer in detail only to the affidavit of Israel Tilden, Jr., who was employed to investigate the attitude of the public towards the defendant. His affidavit contains harsh expressions alleged to have been used towards the defendant by 137 persons interviewed by him. The district attorney presents the affidavits of such of these persons whom he could reach denying the statements and denying any knowledge of the case. I have carefully examined these affidavits, and I find that there are 69 persons clearly identified who unequivocally deny the interview. There are in addition 24 persons who deny the interview, but where there might be some question as to the correct identification of the affiants with the persons interviewed. Ten persons present affidavits denying the use of the expressions, but admitting the interview, and two persons present affidavits which, in my opinion, do not contradict Tilden. I am confident that the defendant acted in good faith in submitting this affidavit, and I express no opinion as to Tilden's good faith in making it. It appears that these alleged statements were not volunteered, but were elicited by conversation directed to this end. Opinions expressed or acquiesced in under such circumstances show no great depth of feeling, and, even if Tilden's affidavit be not intentionally false, it can be given no great weight, especially in view of the fact that he fails to state in how many cases he failed to elicit any opinion. The defendant is entitled in law to the benefit of the presumption of innocence until he has been proven guilty. Unfortunately, however, human minds are not so constituted that after an indictment has been found the public will actually and outside of the court room presume the accused to be innocent. The fairminded, who have no personal acquaintance with the accused or with the facts charged, will try to form no opinion. The inconsiderate, knowing only the charge and not the defense, will rush to the conclusion that the accused is guilty of the charge. The careful man certainly refrains from committing the injustice of expressing an opinion. The careless man loudly expresses his opinion of the guilt of the accused. In a community of the size of New York only a small proportion of the inhabitants have any personal knowledge of the charge or of the probable guilt of the accused. The opinion of the majority is formed by the newspaper accounts of the charge. In every case, therefore, where the newspapers have given a wide publicity to the charge, there will be many expressions of belief in the guilt of the accused and few expressions of belief in his innocence. This is no proof, however, that the sober,

careful, thoughtful citizen accepts the reports of the press, and is influenced by them.  Undoubtedly a person accused of wrong must smart under the charges printed by the newspapers and must smart under the hasty expressions of opinion by the inconsiderate.  Though innocent, he and his friends may well come to believe that, since most of the expressions of opinion are unfavorable, the community is biased against him; but no change in the place of trial should be ordered merely because a considerable number of citizens have by reason of the license of the press formed an opinion against the accused.  At common law the formation and expression of an opinion by a juror touching the guilt or innocence of a person accused of crime was a legal disqualification.  "The statute of 1872 changes the pre-existing rule by enacting, in substance, that an existing opinion or inference as to the guilt or innocence of an accused person should not be a sufficient ground of challenge to a juror if he could declare on oath his belief that such opinion or inference would not influence his verdict, and that he could render an impartial verdict according to the evidence, and the court should be satisfied that the juror did not entertain such a present opinion or impression as would influence his verdict."  People v. McQuade, 110 N. Y. 284, 18 N. E. 156, 1 L. R. A. 273.  The statute providing for a special jury in each county of the state having a population of one million or more enacts that the court may order the trial to be had by a special jury where it appears that the subject-matter of the indictment has been so widely commented upon that the court is satisfied that an ordinary jury cannot without delay and difficulty be obtained to try such issue.  No person shall be selected as a special juror "who doubts his ability to lay aside an opinion formed from newspaper reading or otherwise as to render an impartial verdict upon the evidence uninfluenced by any such opinion or impression."

[5] The mere existence of widespread comment, or even the existence of a widespread belief in the guilt of the accused, is therefore insufficient to prevent the accused from obtaining a fair and impartial trial unless there exists in addition a real prejudice in the community which might perhaps "unconsciously warp the judgment and blind the intelligence of those surrounded by its atmosphere."  Such prejudice was found to exist in the case of People v. Georger, supra, where the court said:

"The expressions of feeling on the part of all classes of citizens  *  *  * indicate that they believed not only that the defendant was guilty of the offenses charged in the indictment, but also indicate that they entertained toward him an extreme feeling of hatred and aversion."

The same prejudice was shown to exist almost necessarily from the nature of the charge in the case of People v. Jackson, 114 App. Div. 697, 100 N. Y. Supp. 126, and was shown with reasonable probability in the case of People v. Diamond, 36 Misc. Rep. 71, 72 N. Y. Supp. 179, where the charge was really one of the issues of a bitter political campaign then in progress.  The existence of such prejudice usually implies a state of public excitement, and necessarily implies a state of general and deep-seated interest in obtaining the conviction

of the accused. Ordinarily in such cases the accused is regarded as a representative of a general class against which the community feels an ineradicable resentment. Such excitement, interest, or resentment is extremely difficult to rouse in this city, and I am convinced that. it has not been roused in this case. The general public in this city are more inclined to regard proven charges with undue levity than to give undue weight to charges of which the accused is presumptively innocent. So far as the industriously circulated charges of the alleged participation of the accused in legislative bribery are concerned, it is quite evident that they have not prevented a jury from giving Gardner a fair trial and acquitting him partly upon the testimony of this defendant. So far as the connection of the accused with the administration of the present mayor is concerned, it seems to me quite evident that the absolutely unqualified confidence of the entire city in the personal honesty of the chief executive has reacted favorably upon the defendant. So far as the charge that the accused resigned while under indictment is concerned, I do not believe that any person fit to be a special juror regards this resignation as any admission of guilt, or in fact doubts but that no man with a proper sense of civic propriety would fail to see the necessity of resigning his office until the dismissal of the charges against him.

The only point still to be considered is whether the nature of the charges themselves and the previous conviction of Reichmann and Cummins are conditions which have produced such prejudice as impairs the defendant's right to a trial which will be fair and impartial beyond suspicion. The defendant's counsel concedes that the mere fact that the defendant is accused of using money belonging to the city does not necessarily require a change of venue. A jury can certainly be obtained in this city without including any juror personally interested in the failure of either the Northern Bank or the Carnegie Trust Company. It does not appear that the city has lost any money by reason of the deposits made by the defendant in the Northern Bank. I can find absolutely no basis for the claim that there is any probability that the defendant cannot obtain a fair trial by the taxpayers of this county.

The district attorney claims that it has been shown that a fair and impartial trial could be had by the result of the Reichmann and Cummins trials. The counsel for Cummins, on the other hand, claims that while the trial justice was eminently fair and impartial, the jury was influenced by unconscious prejudice. The mere fact that the trial counsel did not challenge the fairness of the jury at the trial is not conclusive upon the question whether the jury was in fact absolutely unbiased. The fact, however, that the verdict was not set aside concludes me from considering the fairness of that trial. The previous convictions of Reichmann and Cummins have, in my opinion, not prejudiced the community against the defendant. The charge against him is absolutely different from the charges upon which they have been convicted, and, if ever proven, must be proven by entirely different testimony. The only prejudice he has suffered by Cummins' conviction is that, if Cummins is called as a witness, his conviction

may be shown for the purpose of discrediting him, but that is a right which may be exercised under the established rules of evidence. The defendant further claims that the district attorney has through a system of card records a knowledge of the records of the jurors which gives him an advantage over the accused in using his peremptory challenges not contemplated by the law. The district attorney, however, offers to share these records with the attorney for the defendant, so that on this point there will be absolute equality. Upon all the circumstances disclosed, I have therefore reached the conclusion that while the newspapers have in many instances improperly sought to prejudice this case, and there is a considerable body of thoughtless persons who have accepted the statement of the charges as proof of their truth, they have created no general atmosphere of prejudice which might subtly and unconsciously influence the minds of the jurors; and I am confident that there exists in the community no deep feeling that the defendant is guilty and should be punished. I feel that he can safely go to trial and secure a jury capable of reaching an impartial verdict and of giving to the accused the benefit of the presumption of innocence with which the law seeks to shield him.

Motion is therefore denied.