THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LOUIS BUCHALTER, EMANUEL WEISS and LOUIS CAPONE, Appellants.

Argued June 11, 1942; decided October 30, 1942.

*I. Maurice Wormser* and *Jesse Climenko* for Louis Buchalter, appellant. The trial court committed reversible error in its instructions to the jury. (*People* v. *Thomas*, 240 App. Div. 101; *People* v. *Kresel*, 243 App. Div. 137; *People* v. *Marendi*, 213 N. Y. 600; *People* v. *Cole*, 43 N. Y. 508; *Gallagher* v. *Gallagher*, 92 App. Div. 138; 2 Wigmore on Evidence, § 1367; *People* v. *Becker*, 210 N. Y. 274; *People* v. *Lustig*, 206 N. Y. 162; *People* v. *Swersky*, 216 N. Y. 471; *People* v. *Udwin*, 254 N. Y. 255; *People* v. *Clougher*, 246 N. Y. 106; *People* v. *Demasco*, 240 N. Y. 170.)

*Alfred J. Talley, James I. Cuff, M. M. Kreindler, Harry G. Anderson* and *Samuel Bader* for Emanuel Weiss, appellant. The court's charge deprived the defendant of a fair trial. (*People* v. *Odell*, 230 N. Y. 481; *People* v. *Fanning*, 131 N. Y. 659; *People* v. *Montesanto*, 236 N. Y. 396; *Weare* v. *United States*, 1 Fed. Rep. [2d] 617; *People* v. *Ohanian*, 245 N. Y. 227; *People* v. *Kohn*, 251 N. Y. 375.) The defendant's guilt was not established beyond a reasonable doubt. (*People* v. *Kress*, 284 N. Y. 452.)

*Sydney Rosenthal, Benjamin J. Jacobson, Leon Fischbein* and *Emanuel Rosenberg* for Louis Capone, appellant. The evidence

against Capone was insufficient as a matter of law for submission to the jury, and the indictment should have been dismissed. (*People* v. *Kress*, 284 N. Y. 452; *People* v. *O'Farrell*, 175 N. Y. 323; *People* v. *Deacons*, 109 N. Y. 374; *People* v. *Bennett*, 49 N. Y. 137; *People* v. *Galbo*, 218 N. Y. 283; *People* v. *Giordano*, 213 N. Y. 575; *People* v. *Woltering*, 275 N. Y. 51; *People* v. *Lewis*, 275 N. Y. 33; *Pitts* v. *State*, 43 Miss. 472.)

*Thomas Cradock Hughes, Acting District Attorney* (*Solomon A. Klein, Burton B. Turkus, Henry J. Walsh* and *Edward H. Levine* of counsel), for respondent. Guilt was established beyond a reasonable doubt. (*People* v. *Goldstein*, 285 N. Y. 376; *People* v. *Kress*, 284 N. Y. 452; *Towne* v. *Eisner*, 245 U. S. 418; *People* v. *Reddy*, 261 N. Y. 479; *People* v. *Cohen*, 223 N. Y. 406; *People* v. *Everhardt*, 104 N. Y. 591; *People* v. *Hooghkerk*, 96 N. Y. 149; *People* v. *Feolo*, 284 N. Y. 381; *People* v. *Seidenshner*, 210 N. Y. 341; *People* v. *Rodawald*, 177 N. Y. 408; *People* v. *Becker*, 215 N. Y. 126.) The appellants had a fair trial, free from reversible error. (*People* v. *Hyde*, 75 Misc. Rep. 407; 149 App. Div. 131; *People* v. *Wolter*, 203 N. Y. 484; *People* v. *Chapleau*, 121 N. Y. 266; *People ex rel. Lemon* v. *Supreme Court*, 245 N. Y. 24; *Vogel* v. *Gruaz*, 110 U. S. 311; *Matter of Quarles*, 158 U. S. 532; *Finan* v. *N. Y. C. & H. R. R. R. Co.*, 111 App. Div. 383; *People* v. *Fanning*, 131 N. Y. 659; *People* v. *Odell*, 230 N. Y. 481; *People* v. *Ohanian*, 245 N. Y. 227; *People* v. *Dunn*, 157 N. Y. 528; *People* v. *Thau*, 219 N. Y. 39; *People* v. *Peckens*, 153 N. Y. 576; *People* v. *Goldstein*, 285 N. Y. 376; *People* v. *Russell*, 266 N. Y. 147; *People* v. *Wilcox*, 245 N. Y. 404.)

CONWAY, J. The defendants were indicted with three others for the crime of murder in the first degree. They were represented by able counsel during a trial which lasted about eleven weeks. The record of the trial consists of more than four thousand pages in addition to the twenty-seven hundred pages containing the examination of talesmen.

The questions of law presented by defendants' counsel may best be examined against the background of the facts as found by the jury and the facts are therefore set forth with reasonable fullness as a preface.

The deceased Joseph Rosen was present in his small candy store on Sutter avenue in Brooklyn on Sunday morning September 13, 1936. An automobile was driven up to the door of his store. The occupants riddled the body of Rosen with bullets. There were ten wounds of entrance. One Stamler, a tailor, at the sound of the shooting, looked through his window across the street, saw the automobile pull away and took the license number. A few minutes later an automobile turned the corner of Livonia and Van Sinderen avenues so quickly that the brakes or tires screeched somewhat and attracted the attention of Merlis who had a newspaper stand there. The automobile came to a stop about forty feet from the corner and four men emerged. They walked toward the newspaper stand and up over the trestle which crossed the Long Island Railroad track at that point and which led down into Junius street. The automobile thus abandoned,— a black two-door Chevrolet coach,— had the license number which had been taken by Stamler.

The theory of the prosecution's case was that the defendant Weiss was one of the slayers; that the defendant Capone was one of those who had arranged for the murder, who had laid out the route to be taken by the automobile used in it and that he and others were waiting with two cars at the other side of the trestle on Junius street, to assist in the escape of the slayers; that the defendant, Buchalter, referred to as Lepke by the witnesses throughout the trial, had ordered the death of Rosen through fear that he would testify against him in the so-called Dewey investigation, involving racketeering and extortion. There were three others named in the indictment: Harry Strauss, who had been executed prior to the trial (see *People* v. *Goldstein*, 285 N. Y. 376), James Ferraco, who had not been apprehended, and Philip (Farvel) Cohen as to whom a separate trial had been granted by consent.

All of the defendants were represented by experienced counsel. Buchalter and Weiss were each represented by two attorneys, each of whom was permitted by the court to participate actively in the trial. It is important, for the purpose of discussing one of the law points affecting the charge of the court, and for no other purpose, to indicate and comment upon the defenses interposed by each of the three defendants on trial. The defendant Capone did not testify and called no witnesses. The defendant Weiss did not

testify but called witnesses. He called his mother, his two brothers, his wife and a family friend to testify to an alibi covering the period prior to and at the time of the murder. He also called another witness to impeach the credibility of a prosecution witness, Bernstein. The defendant Buchalter did not testify but called witnesses for the purpose generally of establishing that the deceased was a person of no importance financiallly or in the business world; that the testimony of the wife, daughter and son of the deceased as to the business venture of the deceased and its financial condition was unbelievable, whereas the position of the defendant Buchalter was so important that it was incredible that there was any reason for the defendant Buchalter to order or direct Rosen's death. This was more clearly shown from the language of counsel for the defendant Buchalter in his summation as follows: " I said I did not represent an angel, I meant just this: *I condemn the defendant Buchalter's past life with as great vehemence as I possess.* I am not in sympathy with his activities in the past — I condemn the vicious circle which contrived those people to domineer unions — the racketeers Weinstein and Katz. I condemn them with all the strength I have. It is they who prey upon innocent workmen in this city. I condemn the manufacturers and employers who did not complain to the authorities so that they could put an end to this vicious practice of preying upon labor. But they did not complain — not because they were afraid — because some of them hoped, by yielding to the racketeers of the industry, that they would gain an economic or financial advantage over their competitors. *I condemn every act of the defendant Buchalter's past life.*

    \*    \*    \*    \*    \*    \*    \*

So, gentlemen, do you get my point — that Buchalter, who was being looked for by Dewey *as king of the flour racket and king of the crime racket* — he was looked for by the Government — he had so many charges hurled against him that everybody in this universe was searching for him, that he would worry about a possible misdemeanor? I say, ' Possible misdemeanor ' at the hands of Rosen. What proof is there in this case by anyone that Rosen was roaming the streets of Brownsville threatening to go to Dewey? What could he tell Dewey? Nothing. Because, in telling Dewey that four years ago Buchalter drove him out of business, I take it he

would also have to tell Dewey the good traits of Buchalter — that he got him a job — that he tried to get him another job — that he effectuated transfers and that he got him $100 and $125 a week. What was there that Buchalter had to fear at the hands of Rosen *with thousands of complaints running to Dewey in extortion totaling a half a million dollars? Would he worry about Rosen, an ordinary poor truck driver?* ''

At least one of the witnesses called by Buchalter corroborated in important details the testimony of Rubin, the principal prosecution witness (see *post*).

The defendant Buchalter also called witnesses for the purpose of showing that conversations testified to by some of the witnesses for the prosecution could not have been held, with the accompanying anger and excitement to which testimony was given, because the office in which they were held was small and because others were present therein or in adjoining offices at the times mentioned who would have heard the conversations if they had occurred. Such were the defenses. No time limit was placed by the court upon counsel for the defendants for their summations and the presentation of those defenses.

### Facts

One Max Rubin became an executive board member and one of the finance committee of Local No. 4 of the Cutters Union of the Amalgamated Clothing Workers of America (hereinafter called Amalgamated). Murray Weinstein was business agent and later manager of the local and executive board member of Amalgamated. As an official of the Amalgamated, Rubin came to know the defendant Buchalter and was with him almost daily. He also worked for Buchalter in connection with Local 138 of the Flour Truckmen's Union and the Greater New York Tailors Expressmen's Association. Later Rubin became business agent of Local 240 of the Clothing Drivers and Helpers Union, which was also affiliated with Amalgamated. In 1931 a dispute arose between two groups in Local No. 4 of Amalgamated. Buchalter supported one group, which gained control. Rubin arranged a meeting between the leader of the opposing group and Buchalter, and certain officials were given a year's pay and withdrew from the union. Rubin, however, was

continued by Buchalter as business agent of Local 240. Rubin was present at the meeting, at which it was arranged by a general organizer for Amalgamated, that one Danny Fields and Paul Berger (the "finger man" in the Rosen murder) should be the intermediaries between the Amalgamated and Buchalter.

In 1932 Buchalter told Rubin that the union wished a stoppage on a specific date of all the trucks which carted clothing in and out of New Yorl city. Rubin told Buchalter that he believed he could stop all the trucks except those of three concerns: Garfield Express Co., Branch Storage and New York and New Jersey Transportation Company (the company of Rosen), (hereafter called N. Y. and N. J. Co.), which handled both union and non-union work. The Garfield Express, hereinafter called Garfield, owned by Louis Cooper, was located at Passaic, New Jersey, was non-union, and operated in competition with N. Y. and N. J. Co. in Passaic. N. Y. and N. J. Co. did business in New York, New Jersey and had a little business in Pennsylvania. Buchalter said that the Pennsylvania business had to be abandoned. Rubin visited the N. Y. and N. J. Co. officers and then returned and advised Buchalter that when he told Rosen that he would have to give up the Pennsylvania business Rosen said that that was the only thing he had in the business; that he had no money investments but that he had brought in the Pennsylvania business; that Rosen's two associates also objected.

Buchalter told Rubin he wished to see Rosen and they met in the office of one Weiner, a former business associate of Buchalter. Rubin, Danny Fields and one Gurrah were present. Rosen told Buchalter that the Pennsylvania business was the only thing he had in the N. Y. and N. J. Co., and that if that were lost that he would lose everything. Buchalter then said he wished to see Rosen's books. In response to a telephone message, they were brought by Rosen's daughter, Sylvia, who was a witness upon the trial. Buchalter and Gurrah then went over the books and told Rosen what business he could not take. Rosen said he would be ruined. Rubin told him "not to hit his head against a stone wall." Buchalter then promised that they would do something for him and Rosen left.

As to Louis Cooper, of Garfield, Rubin testified that when Buchalter ordered him to stop his trucks, Cooper refused, saying that he had been double-crossed by the Amalgamated once and did not intend to be double-crossed again. Buchalter said " you have nothing to do about worrying now, I am the Amalgamated, they will not double-cross you this time; " that then Cooper agreed to stop if Buchalter would become his partner in Garfield to which the latter agreed.

The stoppage occurred and Rosen was forced out of N. Y. and N. J. Co. The Garfield Express Co. profited materially as a result. Later Rubin had a talk with Rosen in which the latter complained that everyone else had returned to work after the stoppage but that he was " on the street." When this was reported to Buchalter he asked what could be done and Rubin suggested that Rosen had once worked for Louis Cooper as a foreman and they might get him back there. That Buchalter arranged. About eight months to a year later Cooper discharged Rosen and refused requests both of Rubin and Buchalter to take him back. Rosen was then out of work for sixteen months during which period he complained to Rubin that he was a married man with a family and that they had nothing to eat.

After the appointment of Mr. Dewey as Special Prosecutor, Rubin had a talk with Rosen. Rubin then told Buchalter that they had a desperate man on their hands; that they had to get him a job; that he was doing much talking and that they were likely to get into a lot of trouble but that Rosen was willing to work for anything. Buchalter then arranged to obtain another job for him.

In the spring of 1936 Rosen opened a candy store on Sutter avenue. In June of 1936 Buchalter told Rubin that Rosen was going around Brownsville (in which Sutter avenue is located) " shooting off his mouth that he is going down to Dewey's office." Rubin told Buchalter that he would get the members of Local 240 to patronize Rosen's candy store. Buchalter said he did not care what he did so long as Rosen kept quiet. Rubin called a meeting of the executive board and arranged for the spending of money in Rosen's store.

In July of 1936 Buchalter again told Rubin that Rosen was threatening, in Brownsville, that he was going to Mr. Dewey's office

and was going to testify about Buchalter. Rubin told Buchalter that there was nothing to worry about; that Rosen must be up against it. Thereafter, Sylvia Rosen Greenspan asked Rubin to visit her father. Rubin told Buchalter that he thought it was a good opportunity to straighten Rosen out; Buchalter told him to take two hundred dollars to Rosen and to tell him to stay out of town until he was told to return. Rubin gave Rosen the two hundred dollars and the latter said he would go to his son's place at Reading, Pennsylvania.

The next time Buchalter spoke to Rubin about Rosen was on Friday, September 11, 1936. Buchalter complained that Rosen had stayed at Reading, Pennsylvania, only for a few days and had double-crossed them. He said that Rosen was going around Brownsville threatening to go down to Mr. Dewey. Buchalter said: " Well he is not going down to Dewey or any other place. He and nobody else are going down any place or do any more talking or any talking at all." Rubin begged Buchalter not to be rash, to remember that he (Rubin) had visited Rosen's store in July and to permit him to handle it, saying that he would go over to see Murray Weinstein. Buchalter said he did not care where Rubin went but to straighten Rosen out. Rubin rushed over to Weinstein and asked him to do something about Rosen but Weinstein said he could not do anything. Rubin returned and told that to Buchalter. Buchalter then directed Rubin to get Paul Berger and send him to him right away. Rubin found Berger and told him that Buchalter wanted him. Rubin then left to attend a ball game of the union at Vineland, New Jersey, and stayed at Atlantic City until Sunday noon.

Within forty-eight hours after Buchalter sent for Berger, Rosen was murdered.

Rubin read about the murder on the Monday morning after its commission. He talked with Buchalter about it, pointing out that he had visited Rosen in July and was therefore worried. Buchalter reassured him telling him that he had nothing to worry about so far as Brooklyn was concerned since Brooklyn was all right. In September, Rubin called Buchalter's attention to an article in a New York newspaper, stressing the fact that it did everything but mention Rubin's name and that in effect it made him a principal

in the murder. Again Buchalter told him that he had nothing to worry about because the police were looking for Farvel Cohen (the defendant Philip Cohen, named in the indictment), Shimmy Salles and the defendant Weiss and that, when he was ready, he would send in the first two mentioned for identification purposes, but would not send in Weiss.

In early October, Buchalter told Rubin that an Assistant District Attorney named McCarthy " was going around saying that he is going to make one of the best pinches he has ever made; he is going to collar Lepke and Gurrah for the Rosen murder." He told Rubin to leave town as things were " very hot in Brooklyn;" to go to Glens Falls and to stay with Danny Fields who was hiding there; to take Paul Berger around and to introduce him to the business concerns from whom he was collecting. Rubin returned after a week and saw Buchalter at a hotel in Manhattan. Buchalter told Rubin that he would have to go away again, but in the meantime to stay out of sight of everyone in the clothing industry; that Brooklyn was not yet straightened out and that the Dewey investigation was closing in on everyone. Shortly thereafter Buchalter told Rubin to go to Salt Lake city. Rubin then consulted the lawyer for Local Union 240, Mr. Edward C. Maguire, and thereafter told Buchalter that Mr. Maguire wished to see him.

Rubin and Buchalter visted the offices of Mr. Maguire who was the attorney for the International Brotherhood of Teamsters. Mr. Maguire told them that it was unwise for any man to become a fugitive while an investigation was pending and that it would be ridiculous for a married man with a child to go off as a fugitive indefinitely; that Rubin was a representative of a union and that no union would stand for its representative being off in some unknown place and that the membership would oust him. Mr. Maguire testified that Buchalter interrupted during the early part of the talk and said " If witnesses are not available, investigations collapse." At the conclusion of the talk Buchalter said " I will see about it " and he and Rubin departed.

After they left Mr. Maguire's office, Buchalter told Rubin that he had not wished to say it in the office but the case in Brooklyn would be thrown out; that Assistant District Attorney McCarthy would not handle it any more and that another Assistant District Attorney

would be put on it and then pushed on to something else in another building and that the case would die. Rubin then agreed to go to Salt Lake city. He left on October thirtieth and stayed there at the Carlton Hotel. During the month while he was there he received four fifty-dollar money orders through Western Union. He then returned to New York city and told Buchalter that he was too lonesome to stay longer; Buchalter told him he should not have returned as Brooklyn was not straightened out and investigations were getting very serious. Rubin stayed in New York until early in December when he was told by Buchalter to go to New Orleans and that he would send him money there. Rubin went to New Orleans but returned in a week without telling Buchalter. Then he telephoned Paul Berger and later received a visit from him. Berger told the witness that Buchalter wished to see him, waited while he dressed and then drove him to a place where Buchalter was waiting under an awning. Rubin told Buchalter that he could not stay in New Orleans. Buchalter then asked Rubin how old he was and, being told, said, " It was a ripe age." He was then told to go to Philadelphia to meet one Zenreith, alias Bartfield. The latter and Rubin took an automobile trip which lasted seven weeks during each of which the witness received fifty dollars in cash from New York.

Rubin next saw Buchalter in Washington and told him he was anxious to get back to New York. Buchalter told him he could not come back. After further conversation Buchalter told the witness to go to a Brooklyn hotel where Rubin registered under an assumed name. He was paid fifty dollars a week by Berger during that period. He then took an apartment in Brooklyn. He stayed in that apartment until August. He again talked with Mr. Maguire and then went down to the office of Mr. Dewey at 120 Broadway where he talked with Mr. Hogan (now District Attorney of New York county) and Mr. Ten Eyck, two of Mr. Dewey's assistants. That interview was arranged by Mr. Maguire. Following the interview he went back to work as business agent of Local 240. By that time Buchalter had fled from the State.

Toward the end of September, 1937, Rubin testified before a grand jury in New York county in the Dewey investigation. On October first, four days later, as he was walking toward his home he was shot through the head.

On December 16, 1937, Rubin was examined by Assistant District Attorney McCarthy in the presence of Assistant District Attorney (now District Attorney) Hogan of New York county. He then testified that he never told Rosen to leave town, never gave him any money to go away and that he knew nothing about the Rosen murder.

In amplification and extension of the testimony of this confidant, as well as intermediary and messenger, of Buchalter, of the testimony of those who heard the murder shots, who saw the car driven from the scene and who later saw it abandoned on Van Sinderen avenue by the four perpetrators of the deed and of the testimony of the lawyer for the labor group to whom Buchalter revealed his method of conduct in circumventing the law — " when a witness is not around there cannot be a case "— there was the testimony of some of those actively concerned in the murder.

I shall take first that of Paul Berger for whom Buchalter sent when he finally lost patience both with Rubin and Rosen. Berger was employed by Local No. 4. He acted as a go-between for Buchalter and Weinstein. On the Friday before the murder Rubin gave him Buchalter's message that the latter wished to see him. Berger went to No. 200 Fifth avenue to see Buchalter. Buchalter said " Do you know that Joe Rosen." Upon receiving an affirmative reply he said " I want you to point him out." He and Buchalter then took a cab to Suffolk and Grand streets. Buchalter walked along Suffolk to Broome street and told a man he met there to tell the defendant Mendy Weiss that he wished to see him. Weiss came and Buchalter talked to Weiss for five or ten minutes apart from Berger. Then Buchalter brought Weiss over and told Berger to point Rosen out to Weiss. Berger took Weiss to Brownsville in Brooklyn and, after Weiss had spoken to the defendant Capone, Berger pointed out Rosen to Weiss at the candy store. The murder occurred approximately thirty-six hours later.

Berger read of the murder in the newspaper and later talked with Buchalter about it. Buchalter told him that it would be advisable for Rubin to leave town until things cleared up in Brooklyn. Still later, after Rubin's return from New Orleans, Rubin telephoned and Berger told Buchalter that Rubin was at his home in the Bronx. That was the night that Rubin and Buchalter talked under the awn-

ing near Amsterdam avenue. Later Buchalter and Rubin came back to the automobile and he heard Rubin say: " Listen, Lep, I got to be around somewheres where I can be near my wife and kid." It was then arranged for Rubin to go downtown to stay at a hotel. Berger then drove Rubin home, waited until he obtained his clothes and then drove him downtown where Rubin checked in at a midtown hotel. Subsequently Berger saw Rubin while the latter was living in Brooklyn disguised by a moustache and glasses. He told Buchalter how funny Rubin looked and was directed to keep " pepping him up." In June, 1937, Buchalter told the witness that " things were getting too hot, he will have to lam," and then fled.

In the fall of 1937 the defendant Weiss talked with Berger about the fact that Rubin was " squealing " and asked Berger to point him out to one Schlermer and to work with the latter. Berger then took Rubin to lunch in order that Schlermer might see him. Schlermer reported that he had trailed Rubin to a down-town building. Schlermer also said " that he has got to pick him up again tomorrow around the clothing market and when he goes in to the subway to go home he has got to get in touch with somebody in the Bronx." Then Rubin was shot as he walked toward his home in the Bronx.

Six or seven months later Berger drove with defendant Weiss to Livonia avenue, Brooklyn. Weiss said that he wished Berger to point out Rubin to Magoon. " This time the s.. of a b.... ain't going to be so lucky." The following morning Berger met Magoon and pointed out Rubin. There was delay in shooting Rubin a second time because he was under police protection and it was desired to shoot him without shooting the policeman. Magoon watched in the vicinity of Rubin's house, dressed as a laborer. A policeman questioned him and no further attack on Rubin was made.

In May, 1940, the defendant Weiss fled from the State because of his belief that one of Buchalter's men named Tannenbaum (a witness at the trial) was talking. Weiss was arrested by federal narcotic agents in Kansas City, Mo., on April 6, 1941. He was living under the name of James W. Bell and had cards printed under that name purporting to indicate that he was vice-president of a mining com-

pany. He told the agents that he did not mind going back to New York except that he hated " to sit between O'Dwyer and Dewey." He also said he: " had intended to surrender himself at a later date when O'Dwyer would be out of office." He had with him some diamonds and twenty-seven hundred odd dollars in cash. Berger was arrested in June of 1941 and charged with the murder of Rosen.

The witness *Tannenbaum* went to work for Buchalter in 1931 at thirty-five dollars a week. He took orders from Buchalter and was told by the latter to obey the directions of Gurrah and the defendant Weiss. Tannenbaum's salary was increased from thirty-five dollars to one hundred and twenty-five dollars a week between 1931 and 1936. Two days before Rosen's death Buchalter told Rubin in Tannenbaum's presence that Rosen was one " who will never go down to talk to Dewey about me." He heard Rubin tell Buchalter that he would see Murray Weinstein to see if the matter could not be straightened out. Three or four days later Tannenbaum was in Buchalter's office when the defendant Weiss reported on the Rosen murder. Weiss related that everything had proceeded properly except for the fact that the defendant Harry Strauss to whom Weiss had given strict orders not to do any shooting, began shooting at Rosen as he lay on the floor after having been shot by Weiss. Buchalter said: " All right, what's the difference as long as everyone is clean and you got away all right? " and patted Weiss on the back. Over coffee, shortly afterward, in response to a question Weiss explained that Rosen was " some fellow used to be in the trucking business and that he was threatening to go to Dewey and talk about Lep."

While Tannenbaum had never been convicted of a crime he admitted he had engaged in crimes such as robbery with a gun, sluggings, strike-breaking, throwing stink bombs and in six murders.

*Seymour Magoon* was a witness who testified that he was employed by Harry Strauss, Buggsy Goldstein (both executed, see *People v. Goldstein*, 285 N. Y. 376), the defendant Louis Capone and one Abe Reles (now dead). While he had received his first conviction in 1940, and that for vagrancy, he had stolen fifty or more automobiles and participated as the " wheel-man " in two murders, had shot several persons and committed several assaults.

In the fall of 1938 the defendant Weiss in the presence of the defendant Capone, Strauss and Reles asked him to go to meet Paul Berger and another man on the following morning. Weiss said that Berger would point out Rubin and for him to follow Rubin, to find out his habits and to see if he had a police body-guard with him. On the following day Berger pointed out Rubin and after following him and his body-guard during that day Magoon talked that evening to the defendants Strauss, Weiss, Capone and Reles. The defendant Weiss told him to put on old clothes and to watch Rubin's house in the Bronx. On the following night the defendant Capone, said " that Rubin is hurting Lep and we got to hit him in the head and get rid of him." Magoon followed Rubin for the next three days during which on one occasion he was questioned by a police officer while watching Rubin's house. Magoon reported that incident and the continued presence of Rubin's body-guard. Weiss said " then we will have to whack him and the cop." That was in connection with the preparation for the second projected assault upon Rubin. Reference will later be made to the conversation between the witness and the defendant Capone about a " Friedman thing " (see *post* p. 215).

One *Sholem Bernstein* worked for the defendant Capone. On the Friday before the Rosen murder the witness was in his automobile talking with defendant Harry Strauss. The defendants Capone and Weiss and one Philip (Farvel) Cohen (a defendant also named in the indictment but as to whom there has been a severance) *supra*, approached. They called Strauss from the car. About three-quarters of an hour later they returned and Strauss said " steal a car and get a drop "— a " drop " is a garage in which to place a stolen car. Strauss also told Bernstein, after he had stolen the car and had arranged for the " drop " to meet him at four o'clock on the following afternoon. Without going into details, Bernstein rented a " drop " and with the aid of one Muggsy Cohen, stole a black two-door Chevrolet. On the following day at four o'clock he kept his appointment. The defendant, Capone, complained of the fact that a two-door instead of a four-door car had been stolen but nevertheless showed the witness the route to be followed from Rosen's candy store, where, as Capone said, " here is where somebody is going to be killed." He showed the

route through the various streets to Van Sinderen and Livonia avenues where the car was to be abandoned. Capone went over it seven or eight times. Then the defendant Capone told the witness to steal plates from a car that would not be missed and, after the plates had been put on, to return with the car at ten-thirty o'clock that night. When he returned that night Strauss brought a package with pistols in it and that was put in the compartment of the car. After watching Rosen's store for a period of time it was decided that it would be safer to murder him in the morning when he opened his store. The witness, after putting the car away, went to the home of Farvel Cohen on Eastern parkway. He was told to get some sleep because he would have to be up at five in the morning. The defendant Weiss awakened him and told him to get the automobile and the guns. All then went to the hallway of an apartment house about a block from Sutter avenue. The witness, curiously enough, did not know that it was Rosen who was to be killed. He had never heard his name. After an hour's wait the witness was instructed by the defendant Weiss to get the car and to stop it in front of Rosen's store and to make certain that the motor was running. Before he drove over he saw the defendants Weiss, Strauss and Ferraco. (not apprehended) walk toward the store. Then Weiss and Strauss walked in. Ferraco stayed outside. He heard a number of shots and Weiss and Strauss came running out and with Ferraco entered the car. He followed the route as outlined to Van Sinderen avenue and Livonia avenue. He took the key out of the car and all four got out and walked over the bridge down into Junius street. There Capone had the witness Bernstein's car and Philip (Farvel) Cohen had his own car. Weiss gave the witness his gun and told him to break it and throw it away. Capone told him to take Ferraco and drop him off. Then the defendants Capone, Weiss and Strauss drove away in Cohen's car.

After District Attorney O'Dwyer took office and in February, 1940, this witness fled the State. He stayed for a few weeks at Miami Beach, came back to Brooklyn and then left for Los Angeles. Curiously, Bernstein came to Brooklyn from Miami in March, 1940, in order to see a lawyer. He went to the lawyer's home. There he saw also another lawyer who had been the witness'

"regular" lawyer for many years. Those two lawyers are two of the three who represented the defendant Capone upon this trial. Then in turn he went to San Francisco, Dallas, St. Louis and Chicago. He then returned to Brooklyn and surrendered himself to District Attorney O'Dwyer. After he talked with Mr. O'Dwyer he testified before the grand jury in Brooklyn. He also testified before a grand jury in Sullivan county against one Gangy Cohen and on the latter's trial.

He was not cross-examined by counsel for Buchalter whose name he had not mentioned in his testimony. On cross-examination by counsel for the other defendants, he said that the Rosen murder was the only one in which he took part. He testified that he had helped dispose of a dead body by burial but had not been present when the deceased, one Yuran, had been killed. He testified that at the trial of Gangy Cohen in Sullivan county for the murder of one Walter Sage he had testified truthfully to what Gangy Cohen had told him in Los Angeles, Calif., but admitted that he had testified falsely as to some matters because he did not wish to give information to the "mob" all of whom had not as yet been arrested; that someone in the District Attorney's office, he could not recall whether in Kings county or Sullivan county, had told him not to tell everything for that reason. Apparently the matters about which he did not tell the truth were those involved in the Yuran murder case and the instant case. The indictment in the *Yuran* case had not been tried at the time Bernstein was cross-examined in the *Gangy Cohen* case.

It is of moment that the attorney for Gangy Cohen who cross-examined Bernstein in Sullivan county was the attorney for Philip (Farvel) Cohen, one of the defendants in this case, who has not yet been tried and whose name has been mentioned from time to time (*supra*). At the time of the cross-examination in Sullivan county there were many witnesses who were not under the protection of the District Attorney and many fugitives at large. Bernstein's direct examination in Sullivan county in the *Gangy Cohen* case as to the conversation which he had had with the latter in California took from three to five minutes. His cross-examination by counsel for Gangy Cohen and Philip (Farvel) Cohen took three or four hours. These facts were elicited in the instant case by the District

Attorney undoubtedly for the purpose of arguing to the jury that the cross-examination during the Gangy Cohen trial as to facts affecting the Yuran murder and the Rosen murder, which apparently involved members of the so-called " mob," was to learn about other cases for future use and that there was some justification for Bernstein's concealment of facts. That of course could be no excuse. Be that as it may the facts involving Bernstein's concealment in this regard were placed squarely before the jury. It was for them to weigh the question of whether Bernstein testified truthfully as to being the driver of the murder car in this case and as to the others whom he named. The trial court charged before taking up the facts: " Let me say at the outset of this, please, scrutinize with suspicion and accept with caution and in a degree which accords with the character and extent of the impeachment, the testimony of each witness, and give due weight to all believable evidence put in by the other side which tends to contradict or discredit it. Then decide if you can, is the witness telling the truth now. Put your brains to work on that, because you will need them." We are not the jury and we cannot say that this testimony was unbelievable as a *matter of law.*

There was another instance of falsification in Bernstein's testimony to which I shall refer. He was kept in a hotel and he said that no communication was permitted among those who were kept there or with the outside world. It was shown that he wrote three or four letters threatening his former partner that unless Mrs. Bernstein received the sum of $200 he would inform against him. Bernstein then admitted that he had written the letters. They were not received in evidence after that admission. The court took the position that having admitted his untruthfulness, his credibility was impeached and the letters were irrelevant. The court said the witness had " lied." This ruling was correct but even if incorrect does not constitute reversible error.

The defendant Buchalter called several witnesses to testify to the financial condition of the deceased, and of the N. Y. and N. J. Co. Among those witnesses was one Nat Sobler, an associate of Rosen and secretary of that company. Rosen had been vice-president. He testified that Rosen put no money into the company but brought in the Pennsylvania accounts; that when the " stoppage " occurred

in 1932, to which reference has already been made, Max Rubin told him that he (Sobler) and one Bluestein were to have the New Jersey knee pants business and the New York accounts; that Rubin said that that was what the witness was going to get and that he would have to take it; Sobler said that when he heard that, he fainted; that Rubin told him " *That you are going to get and no more.*" Sobler testified that the " stoppage " began about Monday and that Rosen quit N. Y. and N. J. Co. on Saturday; that on that day Rosen said he was getting a job with the Garfield Express at $100 to $125 a week; that Rosen said " *Louis Buchalter, or Lepke, got in as a partner there and he told Louis Cooper to take me back to work.*" It will be remembered that this was a witness called by Buchalter who, to the extent indicated corroborated Rubin, the chief witness for the prosecution.

*Law*

It is urged that the court committed error in its charge that the jury could reconcile the testimony of Rubin, Bernstein and Berger in connection with the conduct of Buchalter and the so-termed preparatory work on September eleventh. The point is this. The witness Rubin testified that on that day he saw Buchalter at No. 200 Fifth avenue at about one o'clock in the afternoon. Buchalter then complained that Rosen was again talking. Rubin said that he would see Weinstein. That he did and later reported to Buchalter that Weinstein could do nothing. Rubin testified that that report was in the early part of the afternoon and that then Buchalter told him to send Berger to him. Rubin said he gave Berger the message at a time which may have been about two hours after his talk with Buchalter and thus well on in the afternoon. Berger testified that he saw Rubin at Union Square at about five P. M. and then walked uptown to Buchalter's office; that then he and Buchalter went downtown where they met the defendant Weiss at about six or six-fifteen P. M. and Buchalter then told Berger to point out Rosen to Weiss. So much of Berger and Weiss. Now the defendants turn, in support of their argument, to the testimony of Bernstein. He testified that he was in his automobile at Sackman street and Livonia avenue with Strauss at a time between twelve-forty-five and one-fifteen P. M. when the defendants Weiss and Capone and Philip (Farvel) Cohen came up and called Strauss from the car;

that they left him (Bernstein) seated in his car and returned three-quarters of an hour later. Strauss then told Bernstein, in the presence of the others, to " steal a car and get a drop." That would be about two P. M. The complaint of the defendants is that the court charged, after referring to the argument of one of the counsel that the testimony did not " hitch," as follows:

" Gentlemen, I refer you to the record because I don't want you to get twisted up on that. There is not a particle of evidence in the case as to when, *if at all*, Buchalter communicated in reference to the preparation work. *The case is blank on that. There is no way of knowing.* We do not know whether he did so, or, if he did, whether it was in the morning or the afternoon or the evening; but you have the testimony of Bernstein about when he received the alleged instructions to steal a car and hire a drop, which was earlier in the day. Taken in connection with the other facts, or alleged facts, concerning the alleged preparation work, and putting this and that together, you have a right to draw such inference as you see fit. Apparently, in the *argument that was offered*, counsel assumed that Buchalter waited until after the fingering before he gave the instruction; but, under the record, I charge you you are entitled to consider whether or not, at the time of the alleged excited statements by Buchalter during the day, that may be taken as evidence connecting him with either previous instructions or instructions immediately thereafter in connection with the hiring of the drop and the stealing of the car. *I don't say you have a right to draw an inference that he sent such an instruction over the telephone,* but I do say you have a right, if you see fit, to reconcile the testimony by Rubin and by Bernstein and by Paul Berger on the various points of evidence they have testified to in connection with Buchalter and the preparation work on that day, and that the definite hook-up, if true, is the fingering plus the declaration by Buchalter. I feel that for accuracy I should refer to the record on this, so that you won't be misled."

The court then read questions and answers from the testimony and then said: " Now, gentlemen, in going over the text, those are the only questions and answers that I can find covering that point in the direct. It is possible that I have overlooked something that is in the cross. I will be glad to instruct you on that by a

quote if my attention is called to it, but, so far as the time element is concerned, you will note there is nothing there to indicate whether or not Buchalter had contacted in preparation, with the Brooklyn end, for the proposed murder before or after Rubin ran in on him and found him in that state and making those declarations, if that testimony be true — and please remember what the Court said to you about that — no speculation."

Exception was taken to that portion of the charge upon the ground that there was an assumption implicit in the statement that there was an earlier communication between the defendant Buchalter, and somebody else about preparatory work. Further exception was taken because under it the jury had been asked to speculate. The court then said he would straighten the matter out, recalled the jury and charged as follows: " My attention has also been called. to a possible confusion in my charge as to the possibility of a communication having been, even before that, given by Buchalter to somebody in Brooklyn to go ahead with the work of preparation. That would make it, of course, entirely consistent with the time table set up by Bernstein as to when he was given instructions to steal the car and get a drop. I want to correct any possible mischoice of language that might cause a misunderstanding. The case is blind as to whether or not Buchalter communicated. There is no way we know. You cannot presume that he did and you cannot presume that he did not, but I will say that the *argument of one of the counsel* for the defense in attacking the time tables as told by Bernstein as inconsistent with Rubin's testimony and Berger's testimony, is predicated upon an assumption on his part that there was no communication by Buchalter until after Rubin returned and gave word that Weinstein could not do anything. I charge you this — and I think this is accurate and will hold and will not be error — that there is no such presumption, and you are not justified in so presuming. If there is no such presumption, of course, then the *argument* attacking the time table fails. I am not afraid of that charge. There is an exception to all of the defendants on this modification."

That which the court said failed was the " *argument* (of counsel) attacking the time-table." In effect what the court said was that there was no presumption of fact either way. That was correct.

Both the charge and portion " straightening it out " were correct. It is elementary that " in all cases of conflicting testimony the first step in the process of inquiry should be to ascertain whether the apparent inconsistencies it presents may not, without violence, be reconciled." (2 Moore on Facts, § 1142, p. 1280.) Accordingly, " Juries are constantly instructed to reconcile evidence, where they can do so, without the imputation of perjury of any witness." (*Savannah, F. & W. Ry. Co.* v. *Gray*, 85 Ga. 825, 829, per Chief Justice BLECKLEY.) We have said that it is the duty of the jury " to reconcile, if possible, conflicting statements as to material facts." (*Smith* v. *Lehigh Valley R. R. Co.*, 170 N. Y. 394, 400, 401.) Here the statements were reconcilable, and if reconciled, were not inconsistent with the testimony.

Surely, the court properly charged that the jury should endeavor to reconcile the testimony of Rubin, Berger and Bernstein. It may very well be that Buchalter, due to the anger in which Rubin found him at about one P. M. on September 11, 1936, had already sent word to Weiss and Capone that Rosen was to be silenced. On the other hand, it may be that Strauss and Capone and Weiss had their own reasons for telling Bernstein to steal a car and get a " drop " and that those reasons had nothing to do with the slaying of Rosen. Later on that day, when Berger and Weiss had their instructions from Buchalter as to the slaying of Rosen, the previous order to Bernstein to steal a car and get a " drop " may have been made to fit into the new plan. A jury could have so found. In that event or in the event that the jury found that Buchalter had set the machinery in motion before Berger was sent to him, or even before talking with Rubin, the testimony was reconcilable.

That Bernstein did not know that the automobile he was told to steal was to be used for a murder is made evident by his answers that if he had so known he would not have permitted Muggsy Cohen to take the radio out of the car. After the murder he searched out Cohen, obtained the radio, broke it into pieces and disposed of it. For the same reason he said he would not have taken the handle off the door of the car and had a key made for it. He said he thought the automobile was to be used in a " schlamming " (striking on the head with a lead pipe).

It is urged that it was error to permit Rubin on re-direct examination to give an affirmative answer to the question, " Did you give untruthful answers to Mr. McCarthy due to fear of Lepke on your part because of the fact of having been shot, following your testimony before the Dewey Grand Jury? "

Here was a witness who had made untruthful answers to an Assistant District Attorney's questions. He had been shot through the head four days after his testimony before the grand jury, either because, as the defendant Weiss stated to Berger, " We got some information that Max Rubin is squealing and he has got to be hit " or as the defendant Capone told Magoon, " Rubin is hurting Lep and we got to hit him in the head and get rid of him." He had been one of the intermediaries between Buchalter and Rosen. There had been a scene in the court while the jury was absent in which Rubin had lost control of himself when asked for the reason for his untruthful answers to the Assistant District Attorney. The court felt that counsel was seeking to provoke an outbreak in order to move for a mistrial. It was to prevent a further outbreak that the court framed the leading question which the District Attorney was to ask. There was nothing objectionable in that question. It was necessary and proper for the District Attorney to elicit the reason in the witness' mind for his conduct. The " impeached witness may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it." (3 Wigmore on Evidence [3rd ed.], § 1044, p. 737.) As this court said in *People* v. *Chapleau* (121 N. Y. 266, 277): " Here the witnesses in testifying to facts, of which upon the preliminary examination they had denied. knowledge, or which they had suppressed, may have been moved and deterred, as they swore they were, by motives of fright; and they appear to have been perfectly free from improper instigations, or motives to swear falsely. At any rate, it was for the jury to decide whether they were to be believed or not." See also, *People* v. *Weldon* (111 N. Y. 569, 576).

The important factor was the reason which operated upon Rubin's mind. That reason might be a good one or a poor one. It might have a foundation in fact or no foundation at all. The fact that it was in Rubin's mind was no proof that it had any

foundation. All it was offered to prove was that that reason, good or bad, motivated the conduct of the witness. In this instance he had testified before the grand jury and had been promptly shot through the head. He believed that Rosen had been killed because he had not kept quiet. He believed that that killing had occurred pursuant to the orders of Buchalter. Buchalter had told him that the *Rosen* case was to be taken away from the Assistant District Attorney who was even then examining him and given to another and that the latter was to be given other work and sent to another building; that the Rosen case would die. It was Rubin's state of mind that was being inquired into. That state of mind was no proof that Buchalter had anything to do with the shooting of Rubin. No one claimed it was proof of that fact. But that belief did enter into the mind of Rubin and that was the reason he said he did not tell the truth to Assistant District Attorney McCarthy. The question was a proper one.

It is said in the dissenting opinion: " On request of counsel for Capone, the trial judge said to the jury: ' I will charge that unless they believe the testimony of Bernstein connecting Capone, that Capone must be acquitted.' The gist of such connecting testimony was the ungarnished word of Bernstein that the getaway route over which he drove the murder car had been taught to him by Capone the day before the killing of Rosen."

We think that there was more than that.

First as to the facts. Bernstein's testimony in brief was as follows: On the Friday before the Rosen murder he was at Sackman street and Livonia avenue in his automobile talking with Harry Strauss. Along came *Louis Capone*, Mendy Weiss and Philip (Farvel) Cohen. Harry Strauss was in the car with him. They called Strauss out of the car. Mendy Weiss spoke to Strauss. Before Strauss stepped out he told the witness to wait around and not to go away. *Capone* had introduced him to Cohen and Weiss a year before. In about three-quarters of an hour they all came back and Strauss said " Steal a car and get a drop." Strauss asked if he could get one and when he answered " Yes " Strauss said " After you get that, come over tomorrow afternoon at four o'clock on Sackman Street and Livonia Avenue, I want to see you." He went away and rented a " drop " at Lincoln place and Ralph avenue at eight dollars per month.

About one o'clock the following morning he stole an automobile in the East Flatbush section with Muggsy Cohen, a car and radio thief. They stole a black, two-door Chevrolet. They drove it to the "drop" and Muggsy took the radio out. On Saturday morning he took the handle off the door and had a key made. He then had an appointment at four P. M. on Saturday at Sackman street and Livonia avenue with *defendant Capone* and Strauss which he kept. *Capone* asked if he had the automobile in the drop and then what kind of car and complained of the fact that it was a two-door car. Then *Capone* said "Come on, I will show you the job you have to do." Then *Capone* showed him the route; Capone said: "Now watch — this is going to be your job, what to do." As they drove, he showed the witness the candy store (Rosen's) and said: "Here is where somebody is going to be killed." He showed the route through the various streets to Van Sinderen and Livonia avenues. *Capone* went over the route seven or eight times. *Capone* said "This is the place where you drop the car off." Then they went back to Sackman street and Livonia avenue. Strauss came over and *Capone* told him to steal plates — to make sure to take plates at a place where the car would not be missed and after the plates were on to bring the car at ten-thirty o'clock that night to Sackman street and Livonia avenue. He left his automobile with *Capone* after taking out a flashlight, a screwdriver, a pair of pliers and a pair of gloves. He broke into a garage and stole plates. He put the plates on the car he had stolen, broke up the old plates and disposed of them. He waited around and then drove the stolen car to Sackman street and Livonia avenue. He parked it a few doors away and it was inspected by Weiss, Strauss and *Capone*. Weiss started complaining: "What the hell is the matter with you? Why did you get a two door car for?" "You know for a job like this you need a four door car."

After Rosen had been shot Weiss and Strauss came running from the store and with Ferraco jumped into the waiting car of which Bernstein was the driver. He drove along the route to Van Sinderen and Livonia avenues. He took the key out of the car and all four stepped out and walked over the bridge down into Junius street. There *Capone* was waiting with another car, owned by Bernstein, and Cohen had his own car. Weiss gave the wit-

ness his gun and told him to break it and throw it away. *Capone* told him to take Ferraco and drop him off and *Capone*, Weiss and Strauss went away in Cohen's car.

The portion of the charge containing the sentence quoted is as follows: *Counsel for Capone:* " I ask your Honor to charge the jury that in so far as the defendant Capone is concerned, even if they were to believe the testimony of Solomon Bernstein, if they disbelieve the testimony of Seymour Magoon, they must acquit. The Court: I have already charged that and, as the jury knows, I have gone particularly into that point. It is all up to the testimony of Seymour Magoon. Do you believe it? If you do believe it, it is one thing; if you do not believe it, it is another. [Counsel for Capone]: May I have the converse of it in the next request? I ask your Honor to charge the jury that in so far as the defendant Capone is concerned, even if they were to believe the testimony of Seymour Magoon, if they disbelieve the testimony of Solomon Bernstein, in so far as it affects the defendant Capone, they must acquit. The Court: I so charge. That is obvious. Wait a minute. I am a little puzzled about this language as being sufficiently definite as a confession in case Bernstein is not believed. The language is that when that witness was talking to Capone, Capone replied, ' What are you worried about? I worked on the Rosen thing, which was right on Sutter Avenue, and I was not made.' I think that is too indefinite. I will charge that unless they believe the testimony of Bernstein connecting Capone, that Capone must be acquitted. [Counsel for Capone]: There are just a few more. * * *." The charge was correct.

It is next urged as error requiring reversal that the court failed to analyze the evidence in the case so as to present to the jury fairly the conflicting claims of the People and the defendants but on the contrary expressly disavowed that duty. The case cited is *People* v. *Montesanto* (236 N. Y. 396). The last paragraph is no doubt the reason for the citation. We do not think it is justified by the paragraph in question which reads as follows: " In our opinion, *in view of these two matters, taken in connection* with the failure of the court *generally* to analyze the evidence in the case so as to present to the jury fairly the *conflicting claims* of the People and the defendant, the latter was not accorded a fair trial." (p.

407.) That is as far as we have ever gone. Surely it must depend on all the circumstances of the particular case.

We shall now quote the language of the charge upon which defendants must rely in support of this contention:

" Questions of law are for the Court. It is not the purpose of the Court, in making any allusions to evidence, to do so for the purpose of refreshing recollection or particularizing in order to emphasize one point as against another. You heard the witnesses. You heard the evidence exhaustively discussed by counsel. The Court placed *no time limitation* upon the discussion, simply tried to preserve order and dignity, two qualities which are inherent in the administration of justice, and which it is the duty of the Judge to do.

" It is the record of the evidence that counts, and that is left to your memory, to be refreshed in such particulars, if any, as you may desire, by a re-reading of minutes on any particular point, should that be necessary.

* * * * * * *

" These three defendants are tried together because that is provided for by a statute of this State. We cannot question the wisdom of that statute. It was passed by the Legislature and signed by the Governor. It is the law. But that does not lessen your responsibility in seeing that the evidence as against each is properly segregated and applied only as to him.

" I shall have to later come back, and in a sort of way which I hope will be fair, attempt to point out certain parts, possibly the bulk, possibly all of the points of evidence in connection with the defendant or defendants to whom they apply. I will do that as a safeguard against your own confusion, but when I do it, remember it is your own recollection of the record that counts. Try as hard as I may to be fair in epitomizing for the purpose of segregation from, as I said, approximately a million words of record, I do not guarantee it to be true, because I cannot give assurance against the human frailty of making mistakes.

* * * * * * *

" Now, gentlemen, I don't like to review testimony in a long record. I don't think it is humanly possible, with this enormous amount of text, for a judge to do this, no matter how fairly he tries to do so, without being accused of trying to color it.

" Just as with an anthology, any epitomization of record is terribly personal with the person who prepares the epitomization. I know it has to be done in some cases. *I will do it if counsel for the defense request it.* This has been a long trial. Witnesses have been put on in certain order. I don't know how much of the record you remember and how much you don't. A lot of it has been discussed in the summations from the viewpoint of counsel who argued. However, there are certain points of the evidence to which I feel under the necessity of calling your attention, first, because where more than one defendant is tried for a crime and the evidence is different as against the different defendants in its applicability, there should be some sort of an attempt at segregation by the Court as an aid to you *otherwise you might apply evidence against one defendant as against the others, and that would be unfair. That is the purpose of this epitomization.* Please do not gain any impression that it is warranted to be perfect. It is simply intended as a fair summary, and, I hope, a substantially accurate one.

" Also, I express no opinion as to the believability of any of the witnesses on any of the points mentioned.

" Also, this particular summary is not a general one; it is merely a segregation of evidence to *keep you from misapplying it as against certain defendants.*

" The believability of any witness on any of the points mentioned is your job to decide, and I do not go into details of cross-examination because that likewise is your job. These are references purely. Cross-examination is almost impossible to correctly state in such a manner that two people can agree on its fairness because, while direct examination goes right to the point, cross-examination, being for the purpose of breaking down the direct, is largely hit or miss; it is blank cartridge shooting. Once in a while you find it shown that a bullet had hit, but whether there is a hit or not may be a matter of dispute.

" Unless there be an outstanding point come out on cross-examination, the Court would only tend to confuse and mislead the jury if it attempted to discuss it.

" Let me say at the outset of this, please scrutinize with suspicion and accept with caution and in a degree which accords with the character and extent of the impeachment, the testimony of each

witness, and give due weight to all believable evidence put in by the other side which tends *to contradict or discredit it*. Then decide, if you can, is the witness telling the truth now. Put your brains to work on that because you will need them.

\* \* \* \* \* \* \*

" So far as the People's case is concerned, the furthest you can go in figuring out motive on Buchalter's part for wanting Rosen out of the way is that because of a business grudge carried by Rosen against Buchalter, having to do in some manner with the trucking company affairs in relation to the Pennsylvania business apparently, and the grudge relating particularly to Rosen's severance with the business, and apparently blaming Buchalter for it, Buchalter feared that Rosen would reprise by giving information to Mr. Dewey which would get him, Buchalter, in trouble with the authorities. That is enough as motive evidence, if you find these facts to be established to your satisfaction reasonably, but I charge you that motive need not be shown if the case is otherwise sufficient. When I mentioned Weiss and Capone, please bear strictly in mind what I said at the start, that this is purely a segregation to guide you against *misapplication of evidence as against defendants to whom it does not apply*. It is not a discussion of evidentiary values; it is not an expression of belief by the Court as to whether or not you shall accept such testimony as true. For that reason there is no review of cross-examination or of any of the evidence on the several defendants' side of the case. It is strictly and only a segregation.

\* \* \* \* \* \* \*

" *Now as to Capone* — and please pay strict attention, gentlemen, on this point; it is quite important. In mentioning the points of evidence applicable *to this defendant, Capone, I particularly wish to impress upon you the comparative paucity of the corroboration from non-accomplice witnesses so that you won't confuse the evidence applicable to the others and use it against Capone*. Most of the evidence as against this defendant came from the accomplices Berger and Bernstein."

" *Those two items, as I have said, are the only evidence from non-accomplice witnesses* which can be submitted on the question of corroboration. You will have to ask yourselves, ' Is it true? '

Possibly it would be better in view of the great importance of this feature of the case, if, instead of depending on what I have just said, I use just a few minutes more and refer to the exact text of the record, because this must not be carelessly decided; it must be intelligently decided."

Then the court read questions and answers from the record, giving the page numbers at which they occurred. The questions and answers so read take approximately five pages of the charge. Then the court continued:

" Gentlemen, I think that is the text applicable thereto, unless there was something on cross-examination applying to it. You see how it is limited down. It is limited down on corroborative points to what Magoon, the non-accomplice witness, said was his conversation with Capone in which he alleges Capone made reference to the Rosen matter and that he had not been made, and then you have the alleged complicity, according to the testimony I have just read, testified to by Magoon, who is a non-accomplice witness. These are two non-accomplice witnesses.

\* \* \* \* \* \* \*

" If, under the strain of this trial, there has been any evidence of nervousness or strain on the part of counsel or Court, if there have been interchanges which may have shaken the decorum of the court-room, if there have been arguments and recriminations which may seem unnecessary, please overlook and disregard them in coming to your verdict. This includes the Court. The Court is human. It has to be strict, in accordance with the responsibility of its job, whether it likes to be strict or not, but if I have spoken sharply at any time, just forget it. The Court is trying to be fair. It is trying not to express any opinion or to give any impression as to what its own notion is concerning the guilt or innocence of any of these defendants. It is trying to see that the case is kept within reasonable bounds, although it has given a great deal of latitude in this trial. It is trying to see that the jury has it fairly and fully presented as a case so that it may properly decide it.

" I charge you that the law presumes every defendant innocent unless proven guilty beyond a reasonable doubt, the language of the statute being: ' A defendant in a criminal action is presumed to be innocent until the contrary be proved; and in case of a reason-

able doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal.' "

I referred (*supra*), to the defenses interposed by the defendants and to the witnesses called by them in order that I might refer thereto at this point.

This claim of error comes to this: there should be a reversal in this lengthy trial where the guilt, at least of Buchalter and Weiss was clearly established, because after eleven weeks of trial the court did not analyze the evidence so as to present the conflicting claims of the defendants and the People. We have never before said that that was indispensable or constituted reversible error. However, we shall now examine the conflicting claims.

As to the defendant Capone the court told the jury of the " paucity of the corroboration from non-accomplice witnesses " (*supra*), and read the questions and answers relating thereto from the record. Capone had not testified and had called no witnesses. What were the conflicting claims of the People and Capone which should have been analyzed? The defendant claimed to be not guilty and the prosecution witnesses to be untruthful and those claims were surely known to the jury.

As to the defendant Weiss, his defense in substance was an alibi. The court properly charged as to that defense.

As to Buchalter his defense was that he was not guilty, that the deceased was of too little importance for him to direct or order his death and that certain conversations testified to by prosecution witnesses had not occurred. I have quoted from his counsel's argument to the jury to indicate that the jury understood that Buchalter claimed to be innocent and that Rosen was so unimportant that there was no reason or motive for Buchalter to direct his death. His counsel argued at length upon the fact that the prosecution witnesses who testified to conversations in the rooms at No. 200 Fifth avenue were unworthy of belief. His counsel's summation covers one hundred and three pages of the record. The claims of Buchalter were before the jury during the whole of the long trial. On the facts presented here we do not find any error affecting the substantial rights of defendant Buchalter in the failure of the court to analyze his claims after they had been presented at such length by his counsel prior to the charge. On the contrary, so weak was his defense that

great harm might have been occasioned to Buchalter if the court had attempted to analyze the testimony of the witnesses called by him.

We shall now examine the corroborative evidence as to Capone which is discussed in the dissenting opinions.

Magoon testified that in April, 1939, Capone spoke to him with reference to one Friedman. A few days later Magoon saw Capone at the latter's home and asked him "if he thought it was advisable that I work on the Friedman thing because I hung out about a block away and I thought I would be recognized" to which Capone replied: "I worked on the Rosen thing and it was right on Sutter Avenue and I was not made" (identified).

Cross-examination developed little on this phase. After detailed questioning of Magoon on matters affecting credibility the court said that the witness "has already admitted previous crimes, a number of murder combinations and various crimes, it looks to the Court as if it comes down to a flat foot proposition whether or not the jury will, notwithstanding the facts just mentioned, believe he is telling the truth in this particular occasion concerning this particular crime. That is all. The jury requires no further persuasion he is a criminal or that he is a murderer."

Counsel for Capone argues that that could not be considered as corroboration, and I shall take that up later, but assuming for the moment that it could be so considered, he says that that was the only item in Magoon's testimony which could be so considered. Therefore, he argues, that the court erred when it submitted the item which may be referred to as the participation of Capone in the "tailing" of Rubin by Magoon in preparation for another attack on him and Capone's statement on an occasion when Magoon was reporting thereon, "That Rubin is hurting Lep. We have got to hit him in the head and get rid of him." Originally the court submitted those two items, saying: "Those two items, as I have said, are the only evidence from non-accomplice witnesses which can be submitted on the question of corroboration."

As to the complicity of Capone in the "tailing" of Rubin for what the court referred to as the second attempted assassination, I think, it could well be argued that that was corroboration of the testimony of Bernstein and Berger because it evinced consciousness of guilt by Capone in that, knowing that he, Buchalter and Weiss

were all implicated in the murder of Rosen, it was necessary for Capone to become concerned in the spoliation of evidence against anyone of those three because what might become harmful to Buchalter might lead thereafter to the apprehension and conviction of Capone. A jury might find that when Capone put it upon the ground that the witness was to be destroyed because he was hurting " Lep," Capone was thinking of himself but using the name of one of the other guilty men rather than his own name.

I do not think that it is necessary so to argue here because of that which occurred during the requests to charge and which, I think, disposes of this item of the " tailing " of Rubin for the purpose of having him killed. The following I quote: " The Court: 40, I had this penciled notation: There is also testimony of Magoon as to Capone being involved in preparation for intended assassination of Rubin. [Counsel for Capone]: I intend to except to that. I don't want — with your Honor's permission — The Court: The way you frame this, if you want to read it, go ahead and read it. [Counsel for Capone]: 40. I ask your Honor to charge the jury that the only alleged corroboration of the accomplice Solomon Bernstein's testimony in so far as the defendant Capone is concerned, is the alleged oral statement made by the defendant Capone to Seymour Magoon in the year 1939, at the home of the defendant, in which the defendant is alleged to have stated, ' I worked on the Rosen thing right on Sutter Avenue, and I was not made. I hung around there too. What are you worrying about being made? ' The Court: Denied. [Counsel for Capone]: Respectfully except. I ask your Honor to charge the jury, in so far as the alleged statement which I have just read is concerned, that the jury has no right to speculate, surmise, or add to such alleged statement, but if they believe same must determine that in their opinion it is sufficient independent evidence tending to connect the defendant Capone with the crime charged, or they must acquit. The Court: I will have to think about that one. Now you are getting into a deep question of law. [Counsel for Capone]: That is why I said to your Honor I did not want to read it out loud. The Court: I will so charge, that the alleged preparation, if it occurred, in which Capone is alleged to have participated, for the second attempted assassination of Rubin, is of value only in con-

nection with and in event of the declaration previously alleged to have been made by Capone being truthfully testified to by Magoon. [Counsel for Capone]: *Thank you very much."*

That, it seems to us, brings the corroboration, under the charge, down to the one item of conversation in which Capone said that he had worked on the " Rosen thing " and had not been " made " and thus that Magoon need not worry about the " Friedman thing."

Counsel for Capone argues that in order to have that corroboration of the story of the accomplices, the jury must have found that the words " on the " means " implicated in " and that the " Rosen thing " means the " Rosen murder."

We shall assume that to be correct. That was for the jury. The sentence must be read in the light of its setting. Murder is a harsh word. No doubt murderers prefer to use another word. " Implicate " is a lawyer's or a judge's word and not that of a Magoon or a Capone. It was well said in *Weathered* v. *State* (129 Tex. Cr. 514), which was in turn quoted in Wigmore on Evidence ([3rd Ed.] Vol. VII, § 2094, p. 473): " We cannot agree that it is proper to so mutilate the statement made. The setting of a word or words gives character to them, and may wholly change their apparent meaning." In *Towne* v. *Eisner* (245 U. S. 418, 425), HOLMES, J. said: " A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

Let us examine the circumstances and time: (1) Capone, on the day before the murder took Bernstein in an automobile, passed Rosen's candy store on Sutter avenue and said " Here is where somebody is going to be killed; " (2) he showed Bernstein the route to be taken after the murder seven or eight times; (3) in making the quoted statement, Magoon was talking of " work on the Friedman thing " which was to take place " sort of off Sutter Avenue " and Magoon " hung out about a block away; " (4) Capone then said " What are you worried about? I worked on the Rosen thing and it was right on Sutter Avenue and I was not made; " (5) Rosen had been shot and killed on Sutter avenue.

It was for the jury to say under section 399 of the Code of Criminal Procedure whether Capone's statement to Magoon tended to con-

nect him with the commission of the crime. Counsel argues that it would not and says: " The conversation could only be admitted as a circumstance to be considered in determining whether the defendant was implicated in the crime, and would, like other circumstantial evidence, have to lead irresistibly to a conclusion of guilt, to the exclusion of every other reasonable hypothesis to the contrary to a moral certainty. (Wharton on Criminal Evidence, [10th ed.] § 622-b; *People* v. *Bennett,* 49 N. Y. 137.) Otherwise, it would not constitute corroboration." That is not the rule as to corroboration. (*People* v. *Reddy,* 261 N. Y. 479, 484; *People* v. *Kress,* 284 N. Y. 452, 460; *People* v. *Cohen,* 223 N. Y. 406, 426; *People* v. *Elliott,* 106 N. Y. 288, 292; *People* v. *Hooghkerk,* 96 N. Y. 149; *People* v. *Everhardt,* 104 N. Y. 591, 594.)

Although that is not the rule, nevertheless, the court was asked to charge and did charge as follows: " [Counsel for Capone]: All right. I ask your Honor to charge the jury that if, after considering the evidence, they find it is susceptible of two constructions, one indicating the defendant Capone's guilt and the other his innocence, they must give the defendant Capone the benefit of the construction most favorable to him and must acquit him, and if the jury find that the two constructions are evenly balanced, then the People have not met the burden imposed upon them and the jury must acquit the defendant Capone. The Court: I take it, gentlemen, this goes to the question as to whether the language which is alleged by Magoon to have been used by Capone is susceptible of interpretation on the hypothesis of innocence. I have taken great care of Capone's end of the case because of the difference between the corroborative evidence as to him and as to the others. It is so limited in record content, I even went to the extent of quoting verbatim from the record, so there would be no mistake about it. You know the text. Of course, if you think that that is capable of interpretation on the hypothesis of innocence, why, follow that and acquit him. If you think it hooks him up and it is not capable of interpretation on the hypothesis of innocence, and you believe Magoon in that testimony, then you have a right to consider whether or not it corroborates sufficiently to tend to connect Capone with the commission of the crime, the details of which, as against Capone, were testified to by Bernstein and by Berger.

which go into considerable detail. Of course, if this alleged corroborative testimony is found to be true and so tends, you are entitled to convict. Otherwise acquit."

Let us return now for a moment to the quoted portion of the examination about the " Rosen thing ". In *People* v. *Feolo* (284 N. Y. 381, 385) the following was said by the defendant Brabson, " On a murder charge that happened about six years ago in New York City. * * * I thought it blew over, but finally I am going back to New York City on that charge." We were unanimously of the opinion that that statement was a sufficient corroboration of the accomplice, if believed by a jury, and was sufficient to take the case to the jury.

Now we go back to the meaning of the " Friedman thing." The witness Tannenbaum testified on his direct examination without objection: " Q. In the Whitey Friedman murder, what part did you play? A. I fingered him." The witness Magoon testified later in the trial and during his testimony counsel for Capone argued as follows: " May I add just one more thing before the jury comes back. I understand from other counsel, which I did not know, that this man (Magoon) is charged with the Friedman killing and they are going to bring it out on cross-examination, which would make the error still more harmful." Thereafter counsel for Weiss asked Magoon the following questions and received the following replies: " Q. You helped to kill a man named Whitey Friedman, did you not? A. I drove the car on that occasion as well. Q. And you knew that Whitey Friedman was to be killed? A. Yes, sir. Q. When you drove the car? A. Yes, sir. Q. You knew what the job was that night, didn't you? A. Yes, sir. Q. And you drove the men who did kill Whitey Friedman to where Whitey Friedman was? A. The man who killed him. Q. The man who did it. And then you drove that man away, did you, after Whitey Friedman was killed? A. Yes, sir. Q. How was he killed? Was he shot? A. Shot."

Counsel for Capone argues in his brief that if the District Attorney should contend that Magoon in his question to Capone regarding the " Friedman thing " referred to a " Friedman murder ": " Then Magoon's question would constitute proof of another crime, and the admission of this testimony would be error. (*People* v.

*Molineaux,* 168 N. Y. 264; *People* v. *Dolan,* 186 N. Y. 4; *People* v. *Katz,* 209 N. Y. 311.) " The question of Magoon to Capone as to whether he (Magoon) should "work on" the murder of a man named Friedman, would certainly be no proof of another crime by Capone and the mere statement of the proposition is its refutation.

The defendant Weiss also urges that it was reversible error to receive the testimony concerning the alleged attempts of Weiss to have Rubin killed.

It appears that after the murder of Rosen, defendant Weiss stated, according to the testimony of People's witness Berger, that "We got some information that Max Rubin is squealing and he has got to be hit." Magoon testified that after the Rosen murder defendant Capone stated "that Rubin is hurting Lep and we got to hit him in the head and get rid of him." These statements by defendants Weiss and Capone are some evidence that they feared the "squealing" of Rubin and that they feared they would be implicated if Rubin continued to "squeal" or to hurt Buchalter. I have already indicated that Rubin was a key witness in the trial of the instant case, because of his position as a go-between between Buchalter and those who were affected by Buchalter's union activities, Rosen for example. Rubin's past conduct in that capacity had been such that when Buchalter thought it was best for Rubin to get out of town after the Rosen killing, he told Rubin to introduce Berger to the men from whom Rubin was collecting money for Buchalter, evidently intending to use Berger as a go-between successor of Rubin. Defendant Buchalter's efforts to keep the witness Rubin out of town, as indicated in Rubin's testimony, indicate that Buchalter as well as Weiss and Capone realized the key position and importance of Rubin in case of the trial of any charge growing out of the Rosen murder, or any charge which might lead the District Attorney to the uncovering of those responsible for the Rosen murder. There was, therefore, clearly some evidence to indicate not only that all the defendants here were implicated in the shooting of the witness Rubin, but that that attempted murder was made necessary in their eyes by the murder of Rosen and the threats and grand jury testimony of Rubin. From their standpoint it was necessary to remove Rubin and so prevent him from testifying against them. This was in line with Buchalter's statement to Mr. Maguire that

" If witnesses are not available, investigations collapse." It is true that the court charged that the shooting of Rubin and the subsequent " tailing " of him by Magoon was not to be considered against Buchalter but might be considered, if believed, only against Weiss and Capone but that was a ruling favoring Buchalter.

In *People* v. *Place* (157 N. Y. 584), the defendant was accused of killing her step-daughter and the prosecution was allowed to prove an assault by the defendant upon her husband, the father of the murdered girl. This court said, at page 598: " The prosecution was allowed to prove an assault by the defendant upon her husband when he returned home, and when the death of Ida could no longer be concealed unless he was removed or his life destroyed. The demeanor, conduct and acts of a person charged with crime, such as attempted flight, a desire to elude discovery, an anxiety to conceal the crime, or the evidence of it, are always proper subjects of consideration, as indicative of a guilty mind, and in determining the question of the guilt or innocence of the person charged. (Citing cases)." In *People* v. *Thau* (219 N. Y. 39, 42), this court said, quoting with approval from an opinion of Mr. Justice BREWER (afterward an associate justice of the Supreme Court of the United States) in *State* v. *Adams* (20 Kans. 311, 319): " And, on the other hand, it is equally clear that whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. *A party cannot by multiplying his crimes diminish the volume of competent testimony against him.* A man may commit half a dozen distinct crimes and the same facts, or some of them, may tend directly to prove his guilt of all; and on the trial for any one of such crimes it is no objection to the competency of such facts as testimony that they also tend to prove his guilt of the others." (Emphasis supplied). See also, *People* v. *Peckens* (153 N. Y. 576, 594; *People* v. *Katz*, 209 N. Y. 311, 328, 329). In *People* v. *Peckens* (*supra*), at page 594 this court said: " The contention of the appellant, that the evidence of other transactions by the defendant and his confederates was inadmissible, because it tended to prove that they were guilty of other crimes, cannot be sustained. It is well settled by the decisions of this court that while evidence of the commission of one crime is not admissible

to establish a party's guilt of another, yet, that is not inadmissible because it tends to prove another crime if it is otherwise material and relevant. That such evidence is admissible where its purpose is to show intent or guilty knowledge, or where the transaction proved had some relation to or connection with the transaction upon which the indictment was based, or where it formed a link in the chain of circumstances or facts which led up to the transaction involved, we think there can be no doubt under the authorities as they exist in this state. (*People* v. *McLaughlin*, 150 N. Y. 365, 386). This case clearly falls within the exceptions to the general rule, and as the evidence was relevant to the issue it was not inadmissible simply because it tended to prove the defendant and his confederates guilty of other crimes."

In addition, we may say that the rule of *People* v. *Molineux* (168 N. Y. 264, 291), is primarily applicable to a wholly independent crime when there is no connection between the two crimes. (*People* v. *Katz*, 202 N. Y. 311, 327).

Clearly Weiss' attempts to have Rubin killed were directly relevant to the issue on trial. In *People* v. *Spaulding* (309 Ill. 292, 302–306), it was said: " Evidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt (*People* v. *Fox*, 269 Ill. 300) as is also evidence tending to show an attempt to bribe witnesses. (Citing cases). In *People* v. *Roberts*, 306 Ill. 240, evidence showing that the defendant arranged for a conveyance out of the State of the prosecuting witness and gave her money to remain away from the county during the trial was considered admissible for the purpose of showing consciousness of guilt. *State* v. *Keith*, 47 Minn. 559, 50 N. W. 691, and *Blair* v. *State*, 72 Neb. 501, 101 N. W. 17 are similar cases and the holdings are the same. In *Bowman* v. *United States* (267 Fed. Rep. 648), the defendant was convicted of murder. It was held proper to prove that he threatened to kill the only eye-witness to the murder and that he had assaulted the witness with intent to kill." When Rubin returned to the city in violation of Buchalter's instructions Weiss told Berger " we got some information that Max Rubin is squealing and he has got to be hit. I want you to point him out to Schlermer and work with Schlermer." When Weiss was arranging for a second attempt to

eliminate Rubin he said " Look how lucky the s.. of a b.... is. He gets hit in the head and he is still alive. But we will catch up with him yet." Finally when arrested after flight Weiss said " I don't mind going back to New York except that I hate to sit between O'Dwyer and Dewey " and that " I had intentions of surrendering at a later date when O'Dwyer would leave office." He feared the squealing of Rubin because conscious of his guilt in the slaying of Rosen and desired to have Rubin destroyed.

It is urged that it was error for the court to charge: " The believ-ability of any witness on any of the points mentioned in your job to decide, and I do not go into details of cross-examination because that likewise is your job. These are references purely. Cross-examina-tion is almost impossible to correctly state in such a manner that two people can agree on its fairness because, while direct examina-tion goes right to the point, cross-examination, being for the purpose of breaking down the direct, is largely hit or miss: it is blank car-tridge shooting. Once in a while you find it shown that a bullet had hit, but whether there is a hit or not may be a matter of dispute. Unless there be an outstanding point come out on cross-examination, the Court would only tend to confuse and mislead the jury if it attempted to discuss it."

We find no error in that charge. The cross-examination of the witness Bernstein, for instance, covered approximately five hundred pages. One cannot set out cross-examination as one can set out direct examination.

It is then urged that the following charge was incorrect: " There is nothing disreputable in a prosecuting attorney putting on the stand a witness who turns state's evidence. It is a proper method of prosecution and enforcement of the law. When rogues fall out, it is a wise man's delight; so, while the court submits to you con-sideration of the testimony of witnesses who, by their own admis-sions and otherwise are impeached as professional criminals, murderers, thieves, perjurers, in the long run it comes down to this: Are they telling the truth now? If you are not reasonably satisfied that they are telling the truth now, you may not accept and be guided by their testimony, but if you are reasonably satisfied, having viewed with suspicion and accepted with caution their testimony, taking into consideration its impeachment, then you will be guided by it."

When exception was taken the court offered to withdraw it but counsel said he did not wish to be put in the position of asking the court to recall the jury for that purpose and *that it was one of those things that was unintelligible* to him. Nevertheless, after the jury was recalled the court said: " At one place during the charge I quoted an old saw, ' When rogues fall out, wise men delight.' That was intended to have general application. It was not intended as calling the defendants names, but, lest it be misunderstood as having specific application to the defendants as rogues, the Court withdraws and apologizes for it. It was not so meant. Just disregard it."

Counsel for defendants confronted the People's witnesses with their testimony upon other trials. Many or all of them said in substance " if it is in the book it is so " or something similar (the word " book " referring to the record on the cross-examination). In the charge the court referred to that as a normal response and used the sentence, " Well, of course, if a man is asked whether he made an admission a long time ago, he may remember that, but to put a burden upon him of remembering the exact text of question and answer is an unholy thing. We have a court reporter here to supply daily minutes in this case because counsel forget overnight the questions and answers in text form of the day before, * * *." What the court said was helpful to the jury.

Defendants urge that they are entitled to a reversal because the court directed that the issues be tried before a special jury. The answer to that is that it is recited in the order granting the motion for a special jury that the District Attorney appeared in support of the motion and that each attorney for each defendant consented to the granting of the motion.

Defendants urge that they are entitled to a reversal of the judgment of conviction as matter of law because of the denial of their motion for change of venue to another county of the State, made pursuant to subdivision 2 of section 344 of the Code of Criminal Procedure. In our judgment there is no merit in defendants claim for a number of reasons.

In the first place, the defendants were tried before a special jury drawn pursuant to article 18-B of the Judiciary Law (Cons. Laws, ch. 30). Each of the defendants consented to be tried before such

special jury. The statute (Judiciary Law, § 749-aa, subd. 2) provides, " No person shall be selected as such special juror  *  *  * who doubts his ability to lay aside an opinion or impression formed from newspaper reading or otherwise, or to render an impartial verdict upon the evidence, uninfluenced by any such opinion or impression  *  *  *  or who avows that he cannot in all cases give to a defendant who fails to testify as a witness in his own behalf the full benefit of the statutory provision that such defendant's neglect or refusal to testify as a witness in his own behalf shall not create any presumption against him." A similar provision was incorporated in Laws of 1896, chapter 378, and in Laws of 1901, chapter 602. The statute is constitutional (*People* v. *Dunn*, 157 N. Y. 528) and was properly applicable upon proof that the defendants had been indicted for the crime of murder in the first degree. (*People* v. *Hall*, 169 N. Y. 184.) The statute further provides, in subdivision 7, " The rulings of the trial court, however, in admitting or excluding evidence upon the trial of any challenge for actual bias shall not be the subject of exception. Such rulings and the allowance or disallowance of the challenge shall be final." Those provisions have been pronounced constitutional by this court. (*People* v. *Dunn, supra; People* v. *Wolter*, 203 N. Y. 484.)

The motion was addressed to the sound discretion of the court. We are not prepared to say on this record that its denial was an abuse of discretion. (*People* v. *Hyde*, 75 Misc. Rep. 407 [opinion by Mr. Justice LEHMAN, now Chief Judge of this court]; affid., 149 App. Div. 131; *People* v. *Brindell*, 194 App. Div. 776, 781; *People* v. *Hines*, 168 Misc. Rep. 453, 470; *People* v. *Sarvis*, 69 App. Div. 604.) · This may also be said with reference to the motions of the defendants Weiss and Capone for a change of venue and for a severance.

The guilt of the defendants Buchalter and Weiss was clearly established. The guilt of the defendant Capone depended upon whether the jurors believed the testimony of a witness who corroborated the accomplices. That witness was a criminal. The court properly left to the jury the question whether they would believe or disbelieve him. That was peculiarly a jury question. We cannot say that the jury was bound as a matter of law to disbelieve him.

The judgments of conviction should be affirmed.

LEHMAN, Ch. J. (concurring). Joseph Rosen was killed on September 13, 1936, in circumstances which leave little room for doubt that he was shot by a gang of criminals to promote the nefarious purposes of the gang. Almost four years later these defendants were indicted for the murder. The trial took place five years after the murder.

At the trial, witnesses, produced by the District Attorney, testified that they were members of a criminal combination, or gang, or, at least, had friendly and intimate relations with members of a criminal combination or gang which preyed upon the public and which without hesitation and without questioning obeyed the orders of its leaders. According to their testimony violence and murder were ordinary methods of carrying out their criminal purposes. Some of these witnesses, confessed members of this hideously criminal gang, testified that they actually took part in the murder of Rosen in 1936. Others testified that though they were members of the gang and had callously taken part in other murders, they had no criminal connection with the particular murder of which the defendants have been found guilty. Still others, though denying criminal connection with the gang, claimed, or at least admitted, intimate business and social relations with leaders of the gang. Witnesses who had no relations of any kind with the gang or its members, and whose credibility has not been impeached, showed the manner in which the killing was perpetrated and the circumstances surrounding it. Their testimony is not challenged, but it throws little, if any, light upon the identity of the killers, nor does it in any manner tend to connect the defendants with the crime or to corroborate the testimony of the witnesses who admit that they are professional criminals. The only testimony which might serve to cast upon these defendants even serious suspicion of complicity in the crime was given by witnesses who, as matter of law, were, according to their own admission, accomplices in this killing, or men who, according to their admissions were accomplices in other killings by the same gang or, at least, had intimate relations — guilty or otherwise — with its leaders.

The facts *which the People claim* were established by the testimony of these witnesses are exhaustively stated in the opinion of Judge CONWAY. It would serve no purpose to repeat them or,

at this point, to analyze in detail their effect. I point out here only that in any discussion of the questions presented upon this appeal we should bear in mind that all the essential facts which, the People claim, demonstrate beyond reasonable doubt the guilt of these defendants are proven, if at all, only by the testimony of degraded criminals whose credibility is impeached, if not completely destroyed, by a cross-examination in which they admitted a callous disregard of every law, human and divine — including the provisions of both the penal law and of the divine commands against bearing false witness against their neighbors.

The jury is the arbiter of the credibility of the witnesses and of the weight of the evidence produced by the People. It must determine whether that evidence proves the guilt of an accused beyond a reasonable doubt. Whether that evidence is sufficient to overcome the presumption of innocence and to remove all reasonable doubt of guilt is, nonetheless, a question of law which this court may, in all cases, review (*People* v. *Gluck*, 188 N. Y. 167), and when the judgment is one of death this court must also pass upon the question whether the verdict is against the weight of evidence and whether justice requires a new trial. (Code Crim. Proc., § 528.) " While no one doubts that in the great majority of cases the character and credibility of witnesses and the believability of testimony should be left to the final determination of a jury, yet the fact that the statute imposes upon us the absolute duty of deciding whether a verdict in a murder case is against the weight of evidence would seem to make it equally plain that the law contemplates the possibility that a jury may be swayed or led into giving an unjust and unwarranted verdict and requires us to correct the error when it does occur." (*People* v. *Becker*, 210 N. Y. 274, 289.)

An accused, however degraded, is entitled to a fair trial before an impartial jury to whom all competent and material evidence relevant to the charge has been presented and from whom all irrelevant evidence, tending to prejudice them against the defendant, has been withheld. The accused is entitled to demand that the issues of fact be submitted to the jury in a charge which correctly defines the questions upon which the jury is the arbiter and the rules of law which bind the jury and which is calculated to assist the

jury in its deliberations. These are fundamental rights of all accused, guaranteed by the Constitution and part of the freedom which this country is now desperately fighting to maintain. To the extent that the trial court errs either in its rulings or in its charge or fails to safeguard the rights of the accused to a fair trial or intrudes upon the field reserved to the jury and withdraws from the jury questions upon which the jury is the sole arbiter, the verdict of the jury is tainted and is not a conclusive finding of guilt.

We are admonished by the Legislature to disregard technical errors or defects or exceptions which do not affect the substantial rights of the parties. All of us heed that admonition and recognize wholeheartedly its wisdom. Sometimes, perhaps, we need more an admonition to remember that it is the jury, not the court, which weighs the guilt or innocence of the accused, and that errors or defects which taint the finding of guilt by a jury indubitably affect the substantial rights of the accused even though the judges of an appellate court may be of the opinion that guilt has been clearly established. The trial of the defendants has been long. They have been zealously — even hotly — accused by an experienced prosecutor, and they have been zealously — even hotly — defended by experienced counsel. Sometimes zeal greatly exceeded discretion. In such a trial it is not easy for the presiding judge to maintain decorum and to rule correctly at all times. Some lapses and errors are almost inevitable and some indiscretions of speech or conduct, though regrettable, are entirely venial. It is not the duty or function of this court to pardon or to censure; it is its duty to determine whether errors or defects, if any, have tainted the jury's verdict and may have deprived the accused of his right to a judgment of a jury of his peers, arrived at after a fair trial conducted in accordance with the law. After the court has determined that errors or defects are present, it must appraise their effect in their setting at the trial.

Errors and defects must be viewed and weighed as an incident of the trial and in relation to all the other incidents of the trial including all the rulings of the trial court. In weighing them the judges of the appellate court must, so far as they can, form a picture of the whole trial. They must endeavor to see that picture as the jurors saw it. Errors which loom large to a judge, learned in the

law and trained to administer justice in strict accordance with the law, may be scarcely visible to the lay juror. On the other hand, some errors or defects, and perhaps especially those due to excess of zeal of court or prosecuting attorney, may be too easily disregarded by an appellate judge who knows from experience the difficulty of restraining speech and ruling correctly on all questions of law in the heat and hurry of a criminal trial.

The possible effect of error or defect upon the substantial rights of a defendant cannot be measured by any rule of thumb — determination there depends upon the judgment of each appellate judge, and often there is room for difference of opinion.

The errors and defects in this case are, it seems clear to me, many. Judge LOUGHRAN has set forth some which in his opinion cannot be disregarded. I agree with him that these errors and defects are present and these errors and defects and others shown by the record cannot be disregarded without hesitation lest in our anxiety that the guilty should not escape punishment we affirm a judgment, tainted with errors and obtained through violation of fundamental rights. Only careful, I might almost say prayerful, consideration can remove that hesitation.

Upon such consideration I have found it impossible to accept the contention that the record presents few, if any, errors, and that any errors or defects that might conceivably be found should be disregarded as trifles, when weighed in the balance against the mass of evidence produced to establish the defendants' guilt though that evidence comes from a polluted source. With characteristic self-restraint, Judge LOUGHRAN has understated the fact that the proof against the defendants comes from the lips of witnesses of such " low, moral fibre " that " uncertainty concerning the guilt of the defendants is produced to such an extent as to render substantial and reversible an error of law which, under other circumstances, might be regarded as harmless." I shall refer briefly to that " uncertainty " hereafter. I content myself now with the statement that even if the proof were far stronger it would still remain true that " the question of substantial right is not the abstract question of guilt or innocence. A guilty man is entitled to a fair trial and a trial is not fair if the verdict may be related to errors in the judge's charge. Error is substantial when

we can say that it tended to influence the verdict." (*People* v. *Sobieskoda*, 235 N. Y. 411, 420; opinion by POUND, J.)  On the other hand, after consideration of the record I feel constrained to appraise the effect of the errors committed at the trial differently from Judge LOUGHRAN, and I shall state as briefly as I can the reasons for my conclusions.

I take up first the failure of the trial judge to analyze the evidence so as to present to the jury fairly the conflicting claims of the People and the defendants, and the complete omission by the trial judge of any " review of cross-examination or of any of the evidence on the several defendants' side of the case."  The issue of the guilt of the defendants depends, as I have already indicated, almost entirely upon the credibility of the witnesses of the People.  If Bernstein, Berger and Rubin honestly tried to tell the truth there could be no doubt of the guilt of Buchalter and Weiss and perhaps no substantial doubt of the guilt of Capone.  I do not think that it is possible that the jury was misled into the belief that any substantial question was involved other than the credibility of these witnesses.  True the defendant Weiss produced some witnesses to sustain his claimed alibi, but it is impossible, I think, to read this long record without reaching the conclusion that the jury undoubtedly understood that, in final analysis, the vital question which they were called upon to decide was whether the People's witnesses were truthfully fastening upon these defendants a guilty share in the murder of Rosen, or whether they were testifying falsely for the purpose of avoiding, in whole or in part, the penalty which they richly deserved for their own participation in that murder or in other murders.  Some of the judges of this court may think that in the exercise of a wise discretion the trial judge should have pointed out to the jury those considerations which might tend to justify reliance upon the testimony of confessedly degraded witnesses, and those considerations which might lead to the conclusion that there is no truth in such witnesses.  It is the function and duty of the trial judge to explain to the jury the questions of fact which the jury must decide and the rules of law which the jury must accept and apply.  He must be accorded a broad discretion in the selection of testimony which might support the contentions advanced by the parties and also in the emphasis he

should place in his charge upon the contentions of either party in order to make the issues clear to the jury so that it may not be misled after a long trial. A charge which refers to the evidence produced and the arguments advanced by one side alone may tend to mislead the jury into the belief that little can be said for the other side. That would at times constitute an abuse of discretion so serious as to require a new trial in a capital case. I do not find that in this case the failure of the trial judge to review the cross-examination of the People's witnesses, or to review the evidence produced by the defendants could have such effect.

Argument not without weight might, indeed, be made that any attempt to present in the charge a statement or summary of the testimony of the witnesses produced by the defendants would inevitably disclose the lack of substance of such testimony. Nor is it clear that any review of the cross-examination of the People's witnesses though the cross-examination showed clearly the weakness of the testimony of these witnesses would have been helpful to the defendants. The cross-examination of the important witnesses continued for days and no summary could be entirely satisfactory. The omission, even so, would be serious if in contrast the trial judge in his charge has referred to the claims of the People, and the evidence produced by the People in manner which would tend to impress upon the jury the strength of the People's case. I do not find in the charge such contrast. The trial judge was bound to refer to evidence of the People tending to show an admission of guilt or, at least, consciousness of guilt upon the part of individual defendants, in order to warn the jury that such evidence could not be considered against the other defendants. He attempted little more. At the same time, the trial judge explained why he did not review the cross-examination of the People's witnesses or refer to testimony which might be favorable to the defendants. I might wish that the charge had been different. I have concluded nevertheless, that the defect here, if any, could not have misled the jury and does not affect the substantial rights of the defendants.

There are some errors and defects which cause me far more concern. As Judge LOUGHRAN has, in my opinion, completely demonstrated, the trial judge erred at times in ruling on evidence

and at times usurped the function of the jury to draw inferences from the evidence and to determine the facts. I shall refer in this opinion only to those errors and defects which are perhaps the most serious. (1) The exclusion by the trial judge of the letter which the witness Bernstein wrote while in custody with other witnesses, and (2) the charge of the trial judge concerning the " argument attacking the time-table fable." Though I do not refer to each of the other errors and defects set forth in Judge LOUGHRAN's opinion because I consider them less serious, they are not to be cast aside completely. As Judge LOUGHRAN has pointed out, the ultimate question which we must decide is not whether any error or defect standing alone be sufficient to justify the conclusion that it affected a substantial right of the defendant, but rather whether the cumulative effect of the combination of errors and defects resulted in depriving the defendants of a fair trial.

An inordinately long trial was followed by long summation of counsel and the prosecuting attorney had the last word. The District Attorney admitted in his summation that the principal witnesses for the People were men of evil character and counsel for the defense did not attempt to picture the defendants as honest, law abiding citizens. The accusing witnesses and the defendants were, as I have said, members of a gang or, at least, had close relations with leaders of a gang engaged in criminal practices nefarious even beyond the imagination of any fiction writer unless he had the genius of a Balzac. Counsel for the defense, of course, did not fail to point out to the jury that the witnesses for the People were, on their own admission, at least as bad as the defendants on trial and that the jury might infer that the reward offered to them for testifying as they did was a promise that they would escape the penalty for their admitted crimes. The prosecuting attorney was justified in attempting to argue in answer that such criminal gangs cannot be destroyed unless through fear of punishment and hope to escape extreme punishment, some members of the gang could be induced to confess in order to save their own worthless lives and to give testimony against other members of the gang. It is difficult, however, to justify the statement of the District Attorney in his summation: " Don't let anybody fool you with Christmas present nonsense. Gentlemen, the courts have confidence in the

integrity and common sense of juries and jurors. Have a little faith in the integrity of the courts and the prosecutor as to what will happen to witnesses. Right now they are too valuable pieces of bric-a-brac to be dealt with as Lepke, Weiss and Capone would want." In those words there is implicit a promise which the prosecuting attorney could not properly or truthfully make that in due time the witnesses would receive their just deserts.

Conscious as I am that there can be no certainty of the guilt of these defendants since the credibility of the witnesses against them is so seriously impeached, and recognizing as I do that errors and defects at the trial are many, I still reach the conclusion that the verdict of the jury was not influenced by these errors and defects and should not be set aside because of them. The rulings of the trial judge in the admission and exclusion of evidence may have kept from the jury some evidence which would demonstrate the evil character of the witnesses, but the evil character of the witnesses was so clearly demonstrated by other evidence that additional impeachment could, I think, have had no possible effect upon the jury. Nor could any ruling or statement of the trial judge in regard to the bad character of the defendants make the jury more certain of the evil character of the defendants, for that had been overwhelmingly proven by other evidence. The verdict of the jury rests, it is plain, on its conclusion that the story of the People's witnesses is credible and furnishes proof of the defendants' guilt beyond a reasonable doubt, in spite of the pollution of the source of the proof. Explanation for that conclusion may be found in testimony which is not seriously challenged concerning the previous relations of these defendants with the members of the gang and, in the case of Buchalter, to a lesser degree with the murdered man. That testimony is far from sufficient to prove the defendants' guilt. It does not even tend to connect the defendants with the crime, but it is a circumstance which fits into the picture of the crime as drawn by these witnesses whose credibility has been irretrievably impeached. It justifies at least strong suspicion and jurors, quite naturally, are more prone to base a finding upon evidence otherwise lacking in force, but which tends to support a strong suspicion than are judges trained to decide questions of

fact solely upon competent and relevant evidence. The jury has appraised the evidence and in my opinion it cannot reasonably be said that any ruling of the trial judge which is challenged on this appeal may have affected that appraisal.

True, as I have said earlier, the court in the charge instructed the jury as matter of law upon some questions of fact which only the jury had the right to determine, and I may add parenthetically that I doubt whether I would agree with the inferences drawn by the trial judge even if he had been the trier of the facts. I recognize that no intrusion by the trial judge upon the field reserved for the jury may be lightly disregarded. Even so, I conclude that in this case the errors viewed as part of a long trial could not have affected the verdict. It is difficult, perhaps impossible to avoid all error upon such a trial, but the vital question involved was so plain and the meaning of the challenged parts of the charge so obscure that I cannot believe that the jury was misled. It has found the defendants guilty, and though I might have been unwilling, if I had been a member of the jury, to concur in the verdict, I cannot as a judge say that the verdict is against the weight of the evidence.

I cannot refrain from repeating in conclusion that I find the errors and defects numerous and I have hesitated long in reaching the conclusion that they may be disregarded, especially since three of my associates are convinced and have argued persuasively that they affect the substantial rights of the defendants. I regret many incidents that occurred at the trial. I regret the summation of the prosecuting attorney and his remarks in the course of the trial. I regret some of the rulings of the trial judge. Evidence coming from a polluted source has failed to remove reasonable doubt of the defendants' guilt from my mind. All that is immaterial, if the jury is convinced of guilt on sufficient evidence and no errors and defects affected the verdict. Even if I were entirely convinced of the defendants' guilt I should vote to reverse if I found room for doubt that the jury would have reached the same conclusion if all error had been avoided. Because I have no doubt that the errors did not affect the verdict I am constrained to vote to affirm.

LOUGHRAN, J. (dissenting). Early on the morning of Sunday, September 13, 1936, Joseph Rosen was shot to death in a store kept by him at 725 Sutter avenue, Brooklyn. A jury have found

that the homicide was the result of a conspiracy among the three defendants — Buchalter, Weiss and Capone — and that the crime was murder in the first degree.

Buchalter was said to have feared lest Rosen make complaint against him to the District Attorney of the county of New York. For that reason — as the People asserted — Buchalter had commanded Weiss to have Rosen done away with. There is evidence that Weiss killed Rosen with the aid of Capone, Harry Strauss, James Ferraco, Farvel Cohen, Paul Berger and Sholem Bernstein. Strauss, Ferraco and Cohen do not appear in this record either as parties defendant or as witnesses. Berger and Bernstein testified for the People.

(1) The testimony of Bernstein is all-important. He was the chief of the prosecution witnesses. Put into direct discourse, his story in substance was this: In the early afternoon of Friday, September 11, 1936, Strauss, who was then accompanied by Cohen and Capone, met me on a street in Brooklyn where Strauss told me to steal an automobile and find a drop [garage] for it. I did this on that same day. On the next day — Saturday September 12 — Capone pointed out Rosen's store to me as a place where someone was to be killed and then taught me a getaway route. Early the next day — Sunday, September 13 — I drove the stolen car to the vicinity of Rosen's store, as Weiss had told me to do. I saw Weiss, Strauss and Ferraco walk toward the store. I stayed behind the wheel of the stolen car with the motor running. I heard a lot of shots. Weiss, Strauss and Ferraco ran from the store into the car. I started on the route Capone had shown me. I drove to Van Sinderen and Livonia avenues where we abandoned the stolen car. Capone and Cohen met us there with other cars.

These judgments of conviction necessarily rest upon the finding that the above-stated recital by Bernstein was credible evidence. At his own word, Bernstein is a long-time professional criminal. As we shall see in a moment, he is a former perjurer who perversely and flagrantly lied again to the jury on this present trial. By the doubtful testimony of a witness of such low moral fibre, uncertainty concerning the guilt of the defendants is produced to such an extent as to render substantial and reversible an error of law which, under other circumstances, might be regarded as harmless. (*People* v

*Pignataro*, 263 N. Y. 229. See *People* v. *Cashin*, 259 N. Y. 434.) From that point of view, we take up the exceptions of the defendants.

(2) In his testimony, Bernstein did not mention Buchalter. Two other witnesses for the People (Rubin and the accomplice Berger) swore that Buchalter had ordered Weiss to bring about the death of Rosen. Rubin and Berger fixed the time when that order was given as well along in the afternoon of Friday, September 11, 1936, after Rubin (as he said) had reported to Buchalter, " that I went to Murray Weinstein to do something for me about Joe Rosen and that Murray Weinstein said he can't do anything." On the other hand, Bernstein swore it was earlier in the afternoon of that day when Strauss had requested him to steal the murder car. As to this surface inconsistency in the proof of the People, the trial judge in his charge said to the jury: " There is not a particle of evidence in the case as to when, if at all, Buchalter communicated in reference to the preparation work. The case is blank on that. There is no way of knowing. We do not know whether he did so, or, if he did, whether it was in the morning or the afternoon or the evening; but you have the testimony of Bernstein about when he received the alleged instructions to steal a car and hire a drop, which was earlier in the day. Taken in connection with the other facts or alleged facts, concerning the alleged preparation work, and putting this and that together, you have a right to draw such inference as you see fit."

After the jury had retired, the judge recalled them and further charged upon the same subject in this manner: " The case is blind as to whether or not Buchalter communicated. There is no way we know. You cannot presume that he did and you cannot presume that he did not, but I will say that the argument of one of the counsel for the defense in attacking the time tables as told by Bernstein as inconsistent with Rubin's testimony and Berger's testimony, is predicated upon an assumption on his part that there was no communication by Buchalter until after Rubin returned and gave word that Weinstein could not do anything. I charge you this — and I think this is accurate and will hold and will not be error — that there is no such presumption, and you are not justified in so presuming. If there is no such presumption, of course, then the argument attacking the time table fails."

Thus the last word of the judge withdrew from the jury a vital issue of fact and disposed of it in favor of the People as matter of law. This was obvious error. " What the evidence is "— also " what it proves — what credit a witness is entitled to, and all like things, are [in criminal cases] exclusively for the jury; and any charge is ill which takes this from them, or in any degree obstructs their free action thereon." (2 Bishop's New Criminal Procedure, [2d ed.], pp. 819, 820.)

(3) For more than a year prior to this trial, Bernstein had been kept in custody at a hotel as one of a group described by him as members of " the mob." The main contention of the defense was that Bernstein's testimony against the defendants had been there fabricated by this group in an endeavor to shift the incidence of the death penalty for the killing of Rosen. This contention went to the heart of the People's case. (*People* v. *Becker*, 210 N. Y. 274, 308, 309.) As an answer, Bernstein testified that during his confinement in the hotel he was under surveillance day and night by the police. Though that testimony was uncorroborated, the trial judge refused to let the jury pass upon its credibility. More than that, the judge certified to the trustworthiness of that testimony in this way: " You cannot lock criminals together when they are waiting their turn to be called to testify and let them put their heads together and maybe plot something behind the backs of the police. That would be sloppy police work, to permit discussion." The judge was without power so to invade the province of the jury.

(4) On cross-examination, Bernstein denied any letter had been written or sent by him while he was in custody at the hotel. Confronted then with three letters written in his own hand upon the hotel stationery, he owned he had lied. The quality of these documents is exhibited by the following excerpt: " Do you know how many guys are pinched just for conversation. Why do you make me write like this. I don't want to hurt you. Again I want to know did I do you any harm the way you are *defying* me. Well there is no *sence* of me trying to threaten you if you want it that away. So *Cherry* you are *making* me do this that I don't want all for $200 dollars. I just want to remind you *years* don't mean anything to me." (The emphasis was first hand.)

The trial judge refused to receive these letters in evidence. Here again there is need to remember how the case for the People hangs on the credibility of Bernstein as a witness. Once more there is need also to keep in mind the theory of the People that at the hotel Bernstein was never free to concert with others in respect of his role upon this trial. In both aspects, these letters were proximately relevant evidence on the side of the defendants. We think the text thereof should have been put before the jury. (See *People* v. *Becker*, 210 N. Y. 274, 298.)

(5) After Rosen had been killed but before the trial of the present case, Bernstein was a prosecution witness on a trial held at Monticello, Sullivan county. On that trial, he tried to swear away the life of one Gangy Cohen who was there accused of another murder. As regards his former testimony in the *Cohen* case, Bernstein was examined on the present trial as follows: " Q. Did you testify in the trial of Gangy Cohen to anything that was not true? A. Yes, sir, I knew I was doing wrong. Q. Did you fail to testify to some things that were true? A. Yes, sir, I knew I was doing wrong. * * * Q. Were you asked these questions and did you give these answers? A. My mind is very clear. Go ahead. * * * ' *Question:* And you had nothing to do with any murder on any occasion? *Answer:* That is right.' Q. Were you asked that question and did you give that answer? A. Yes, sir."

It was manifestly the duty of the trial judge to warn the jury specifically of the necessity for wariness on their part in consequence of this confession by Bernstein that where another life depended on his oath he had corruptly suppressed his participation in the murder here ascribed by him to two of these defendants. (Cf. *Dunn* v. *People*, 29 N. Y. 523.) The judge said: " The answer given to the question you have just read in the other trial could be viewed as being meant to be true if the witness considered it referred to the actual shooting. It would be untrue in relation to his being a principal under section 2 of the Penal Law, in the other work than killing." This animadversion was very much in the nature of a charge to the jury. (*People* v. *Wood*, 126 N. Y. 249, 269.) In our judgment, the exception taken thereto is valid.

(6) The sole support for Bernstein's accomplice-story against Capone was the People's witness Magoon. It was said by Magoon

that Capone had made to him an oral utterance in these words: " I worked on the Rosen thing and it was right on Sutter Avenue and I was not made." In the declared opinion of the trial judge, the statement so reported by Magoon was " too indefinite " to be used as a confession of guilt on the part of Capone. At the same time, however, the judge directed the jury that Magoon's testimony (if credited) could be taken as corroborative evidence tending to connect Capone with the murder of Rosen. This was a controlling ruling. Belief in the actuality of Capone's oral admission as reported by Magoon was an indispensable condition of the finding of Capone's guilt. Hence the affirmance of these judgments of conviction must bespeak the conclusion of this court that the testimony of Magoon is not an altogether insufficient ground for the signing of the death warrant of Capone. (See *People* v. *Crum*, 272 N. Y. 348.) On this angle of the case we have felt — and still feel — no little concern.

A testimonial report of an oral admission of a party-litigant is generally the most dangerous evidence that can be received in a court of justice, and the most liable to abuse. (*Law* v. *Merrills*, 6 Wend. 268, 277.) Even when the admission is reported by a reputable witness, the testimony is often the weakest and most unsatisfactory of all the kinds of evidence. (See the authorities set forth in 7 Wigmore on Evidence, [3rd ed.] § 2094, p. 468.) Magoon was not a reputable witness. He is a self-confessed murderer. His appearance on the witness stand had no object but the saving of his own skin. There is thus grave question whether the above word of Magoon standing alone can in good conscience be accepted as a sufficient prop for what (as we are about to see) was a revision by Bernstein of his original evidence against Capone. For the purpose of this opinion only, we shall assume that the finding of Capone's guilt is not against the weight of the evidence; but we stress this phase of the record as a strong contradiction of any assertion of the conclusive quality of the proof for the People.

(7) On request of counsel for Capone, the trial judge said to the jury: " I will charge that unless they believe the testimony of Bernstein connecting Capone, that Capone must be acquitted." The gist of such connecting testimony was the ungarnished word

of Bernstein that the getaway route over which he drove the murder car had been taught to him by Capone the day before the killing of Rosen.

During Bernstein's cross-examination on that critical issue, the trial judge made rulings as follows: " *Mr. Rosenthal* [Capone's counsel]: Q. You turned where on Pennsylvania Avenue, what turn left or right? A. Left. Q. How many blocks did you go then? A. One block, sir, to Dumont, made a right turn on Dumont. Q. And then you went straight down Dumont, didn't you? A. Yes, sir. Q. For six blocks? A. I don't know how many blocks. I went to Snediker Avenue, sir. Q. You knew Snediker Avenue — A. Yes, couldn't miss that because it was a one way street. Q. Will you please wait until I finish the question. You knew where Snediker Avenue lay from Pennsylvania, didn't you? *Mr. Turkus* [the trial prosecutor]: Objected to. Just answered it was a one way street * * * *Mr. Rosenthal:* Q. Did you know where Snediker Avenue lay from Pennsylvania Avenue, going down on Dumont Street? *Mr. Turkus:* Objected to as repetitious. *Mr. Rosenthal:* I have not asked it yet. *The Court:* Sustained. *Mr. Rosenthal:* Exception. * * * Q. Did you go slowly over the route? A. What do you mean slowly? I came from the store and the turns, that's where I had to watch myself, sir, them turns — the only thing I really had to know, sir, them turns. Q. As you were coming from the store, on this Saturday, did you slow up at each turn? A. Yes, sir. Louis Capone drove the car, sir. He drove my car all the time, sir. Q. Did he drive slowly over the route? *Mr. Turkus:* Objected to as repetitious. *The Court:* Sustained. *Mr. Rosenthal:* I respectfully except, sir. * * * Q. After you had come to a stop at Van Sinderen Avenue, was there any talk between you and Capone? A. While riding in the car, he told me, ' watch ' * * * He says, ' This is the route you are going to take.' * * * Q. Is that all he said? A. Then he went over the route again and showed me, to make sure. Q. I first asked you is that all he said while you were at that point. Is that all he said? A. I didn't have a book and wrote down everything what he said to me, sir. Q. Is that all you remember he said? *Mr. Turkus:* Objected to as repetitious. *The Court:* Sustained. *Mr. Rosenthal:* Exception."

We think these exceptions are not without merit. Mr. Wigmore says: " Repeating precisely the *same allowable question on cross-examination,* in order by sheer moral force to compel a witness to admit the truth, *after an original false answer* or *refusal to answer,* is a process which not only savors of intimidation and browbeating, but also tends to waste time. * * * Nevertheless, when used sparingly and against a witness who in the cross-examiner's belief is falsifying, there ought to be no judicial interference * * *. Simple as this expedient seems, it rests on a sound psychology; and the annals of our trials demonstrate its power." (3 Wigmore on Evidence [3d ed.] § 782, p. 146. See, also, 1 Chamberlayne, The Modern Law of Evidence, § 553.)

The cogency of this view was here proved again when the testimony of Bernstein before the grand jury came to light. He had there sworn it was he — Bernstein — who drove the car in which he learned the getaway route. Faced with that self-contradiction, Bernstein said: " That is a mistake, sir. I made the mistake, sir." This was not the only particular in which Bernstein's evidence before the grand jury was at variance with his recital on this trial of the part played by Capone in the murder of Rosen. The case against Capone, we repeat, had no foundation other than the testimony of Bernstein to which the foregoing cross-examination was directed. No one can be sure the verdict against Capone was not the result of an undue restriction of his essential right so to test the credibility of that testimony.

(8) Early in his summation, the trial prosecutor posed these queries to the jury: " To begin with did anybody here tell you that Sholem Bernstein did not steal the murder car? Did anybody do that? Did anybody show you that he did not steal the plates? Did anybody say to you that he did not chauffeur the murder car when Rosen was killed? " Since none of the defendants was a witness, the whole point of that argumentation was its erroneous accent upon the assertion by them of their constitutional privilege against compulsory self-incrimination. In our judgment the exception taken thereto is valid. (See *People* v. *Watson*, 216 N. Y. 565.)

As the opinion of the chief judge shows, the trial prosecutor in his summation gave to the jury an unfounded pledge as to the

future of the accomplice witnesses. This pledge was buttressed by the trial prosecutor in these words: " Whatever my lot in life may be, whether I go out of office or stay in, whatever the future holds for me, I say to you with all due solemnity, that nothing I have ever learned as a public prosecutor, no talent that I now enjoy, would ever be used in any way with any of you to make you feel that I had discredited you or myself or any member of the public. And that is just for me alone. And one more thought — if I could spend the rest of my life fighting this type of situation, I would like it. And that ends it." When objection was made to this plea, the trial judge said: " We will have no further interruption." A majority of this court is gravely apprehensive that such diffuse departures from legitimate argument may have unduly prejudiced the jury against the defendants. (See *People* v. *Mull*, 167 N. Y. 247; *State* v. *Clark*, 114 Minn. 342.)

(9) Numerous exceptions to the charge of the trial judge are pressed upon us. For instance: The cross-examination of the People's witnesses concerning prior contradictory statements made by them was not ineffective, as we have seen. In that connection, the trial judge said to the jury: " Well, of course, if a man is asked whether he made an admission a long time ago, he may remember that, but to put a burden upon him of remembering the exact text of question and answer is an unholy thing."

Again: The trial judge said this to the jury: " There is nothing disreputable in a prosecuting attorney putting on the stand a witness who turns State's evidence. It is a proper method of prosecution and enforcement of the law. When rogues fall out it is a wise man's delight." Although the jury were brought back from their deliberations and advised to disregard the epigram last quoted from the charge, we are still left with the vexed question whether the belated admonition of the court sufficed to remove the obvious intimation which was conveyed to the jury by so pithy a dictum from the bench. (Cf. *People* v. *Robinson*, 273 N. Y. 438.) But we pass the exceptions to these matters, because in any event the charge as a whole fell below the requisite standard.

The trial judge at least was bound generally to analyze the evidence in the case so as to present to the jury fairly the conflicting claims of the People and the defendants. (*People* v. *Montesanto.*

236 N. Y. 396.) He expressly disavowed that duty. In defining the scope of his instructions to the jury, he said therein: " This is purely a segregation to guide you against misapplication of the evidence as against defendants to whom it does not apply. It is not a discussion of evidentiary values; it is not an expression of belief by the Court as to whether you shall accept such testimony as true. For that reason there is no review of cross-examination or of any of the evidence on the several defendants' side of the case."

In keeping with that announced purpose, the charge made no reference whatever to any one of the above-stated impeaching facts that were brought out during the cross-examination of witnesses for the People. That aspect of the case was dismissed by the judge in this fashion: " Cross-examination is almost impossible to correctly state in such a manner that two people will agree on its fairness because, while direct examination goes right to the point, cross-examination, being for the purpose of breaking down the direct, it is largely hit or miss; it is blank cartridge shooting. Once in a while you find that a bullet had hit, but whether there is a hit or not may be a matter of dispute. Unless there be an outstanding point come out on cross-examination, the Court would only tend to confuse and mislead the jury if it attempted to discuss it."

As an inevitable consequence of these conceptions of his function, the judge's treatment of the proofs took on the character of a summation for the People. We will not say such a charge was right. (See *People* v. *Becker*, 210 N. Y. 274, 307.)

(10) Nor do we think the one-sidedness thereof was corrected when counsel for the defendants requested further instructions in respect of specific items of the self-impeachment of witnesses for the People. In response thereto, the judge in some instances made this oblique remark to the jury: " You may consider that for what, if anything, it is worth." In other instances, the request brought forth a commentary which aided the People by toning down the contradictory statements of their witnesses. For example —

The main proof against Buchalter came from the witness Rubin whose testimony makes up a large part of " the facts " which Judge Conway has marshalled in his opinion. On cross-examination, Rubin was confronted with a statement made by him in Decem-

ber, 1937, to Mr. McCarthy (then an assistant district attorney) covering this *Rosen* case. Conceding the verbal correctness thereof, Rubin acknowledged that this statement " did not implicate the defendant Buchalter, or Lepke, in any respect whatever."

When counsel for Buchalter requested that the jury be directed to take notice of Rubin's contradictory statement to Mr. McCarthy, the trial judge said: " On the second point of that request, he [Rubin] did not testify before McCarthy at all. He was not under oath. That is not perjury. That is a contradiction and he has explained it. He says he had been shot through the head because of testifying before the Dewey grand jury, and he was afraid to give McCarthy any information about the *Rosen* case. I charge the jury that they can consider the explanation in connection with the apparent evasion on that point before Mr. McCarthy. If it was on the basis of fear, they can consider the extent, if any, to which it ameliorates the contradiction and whether or not the contradiction, admittedly so before McCarthy, really amounts to anything at all. He was under no obligation to give any evidence; it was not sworn to before any official, so far as legal procedure is concerned; it was not compulsory." This argument in support of Rubin's credibility was inadmissible. Evidence of a prior self-contradiction by a witness, " is founded on the obvious consideration that both accounts cannot be true, and tends to prove a defect of intelligence or memory on the subject testified of, or what is worse, a want of moral honesty and regard to truth, and so, in either case, that the witness is less worthy of belief." (SHAW, C. J., in *Commonwealth* v. *Starkweather*, 10 Cush. [Mass.] 59, 60.) Hence the fact that Rubin had not sworn to his contradictory statement to Mr. McCarthy was immaterial. (3 Wigmore on Evidence, [3rd ed.] § 1044, p. 727.)

(11) Rubin's testimony was offered to show the alleged motive for this crime,— fear lest Rosen vent a business grievance by instigating a criminal prosecution of Buchalter. To the same end, members of the family of Rosen · endeavored by their testimony to show his prominence in the commercial field in which Buchalter was active in labor affairs; but the trial judge struck out that testimony as being " too sketchy to have any value as evidence." As a result there was no contradiction of witnesses for Buchalter

who testified to the indifference of Rosen's success as a man of business. In that state of the case, Buchalter at least was entitled to have the jury consider whether he was right in his claim of the absence of any compelling reason why he should have been greatly afraid of the enmity of so inconspicuous a person as Rosen. (See *People* v. *Becker*, 215 N. Y. 126, 135.)

On this issue, the trial judge in his charge said to the jury: " So far as the People's case is concerned, the furthest you can go in figuring out motive on Buchalter's part for wanting Rosen out of the way is that because of a business grudge carried by Rosen against Buchalter, having to do in some manner with the trucking company affairs in relation to the Pennsylvania business, and apparently blaming Buchalter for it, Buchalter feared that Rosen would reprise by giving information to Mr. Dewey which would get him, Buchalter, in trouble with the authorities." But the next phrase of the judge was this: " That is enough as motive evidence, if you find these facts to be established to your satisfaction, reasonably." The judge was without power so to deal with the effect of evidence as proving the case against Buchalter. At this point again, there should have been a presentation of both sides of the issue,— and the question of the weight of the evidence should in any event have been submitted to the jury.

In the preceding subdivision 2 of this opinion, we indicated another important issue of fact which was even more strongly ruled against Buchalter by the trial judge. On the whole, we find ourselves unable to perceive how the basic finding of Buchalter's distant connection with the actual shooting of Rosen can be taken to have been made by the jury alone.

(12) For a final word: We believe the foregoing combination of errors cannot rightly be looked upon as a technical defect. Of course this crime was an atrocious thing and the defendants apparently were men of past bad moral disposition. But these considerations are nothing to our purpose: it is for us to keep to the question whether the trial was fair. This last, as has so often been said, is the great requirement of this court's own function in all capital cases,— even when, as in this instance, the evil life of an accused may be an influence to warp the less responsible judgment of others. (*People* v. *Marwig*, 227 N. Y. 382, 389.)

Through many generations, common law practice in criminal cases has been governed by certain fundamental rules, namely: " The jury is the final arbiter of every question of fact." (*People* v. *Pignataro*, 263 N. Y. 229, 240.) " The court's charge is of supreme importance to the accused. It should be the safeguard of fairness and impartiality and the guarantee of judicial indifference to individuals." (*People* v. *Odell*, 230 N. Y. 481, 487.) On the present trial this historic practice was virtually declared away. We do not see how the conviction of the defendants can be affirmed, without annulling the statute which makes the jury in a criminal case the exclusive judges of questions of fact. Nor do we see how an affirmance is possible without deciding that in a criminal case the trial judge in his charge may entirely ignore the evidence and the contentions of the accused unless in the end some request is made for a different handling of the issues.

Nor do we see how the inexpedient course of the trial can be said to have had no relation to the verdict. The challenged rulings necessarily strengthened the position of the People. With the sanction of the court, the trial prosecutor made his personal integrity a factor against the defendants. We do not feel at liberty to suppose all this was without significance in the jury room. " The determination of the facts rests wholly with the jury. It is for the court to instruct them as to the law, and these instructions they are bound to follow. If materially erroneous it is the imperative duty of the appellate tribunal to grant a new trial." (*Stokes* v. *People*, 53 N. Y. 164, 184.)

We believe the judgments of conviction should be reversed so that the defendants may have a fair chance to defend their lives before another jury.

RIPPEY, J. (dissenting). I agree with all that Judge LOUGHRAN has said concerning the errors committed during the progress of the trial, that such errors were prejudicial and cannot be overlooked. Reference might have been made to other errors. Among those was the charge substantially to the effect that the burden rested upon Weiss to establish his innocence on the basis of his alibi defense. (*People* v. *Vaccaro*, 288 N. Y. 170.) I also agree with

Judge LOUGHRAN that the trial was unfair. In my opinion, the conduct of the trial throughout was so grossly unfair as to leave the defendants without even a remote outside chance of any free consideration by the jury of their defenses, so unfair in fact as to render utterly without force the presumption of innocence to which every person charged with a criminal offense is entitled until his guilt is established by legal evidence beyond a reasonable doubt. It does not follow that a new trial should be ordered. There was insufficient legal evidence at the close of the People's case upon which to base a conviction of Capone and the indictment against him should have been dismissed. In spite of the summary of the contentions of the People contained in one of the opinions for affirmance, an analysis of the whole record persuades me that the evidence was insufficient as matter of law to sustain the conviction of any of the defendants of murder in the first degree beyond a reasonable doubt.

The judgments of conviction should be reversed as to all of the defendants and the indictments dismissed.

FINCH and LEWIS, JJ., concur with CONWAY, J., LEHMAN, Ch. J., concurs in result in separate opinion; LOUGHRAN, J., dissents in opinion in which DESMOND, J., concurs; RIPPEY, J., dissents in separate opinion.

Judgments of conviction affirmed.　(See 289 N. Y. 244.)